SELECT CREATIONS, INC., a Wisconsin corporation, Plaintiff,

v.

PALIAFITO AMERICA, INC., an Illinois corporation, Defendant, Counterplaintiff and Third–Party Plaintiff,

v.

Miryoung (or "Mi Ryoung") LEE a/k/a "Joy Lee" "Melody Lee," "Miryoung Song," "Miryoung Deering," "Miryoung Deering Song" and "Miryoung Melody Lee," an alien (No. A 36510736), Jong Sik (a/k/a "Jerry") Lee, an alien, Mantae Company Limited, a Korean corporation, Many Amazing Ideas, Inc. f/k/a "Mantae America, Inc.," a New York corporation, Mai Ltd., a Korean corporation, Puff Pac Production, Ltd., a Korean corporation, Best International Corp., a Korean corporation, Chusik Hosea Kyongyong a/k/a "Marue Joint Stock Trading Company" d/b/a "Best General Merchandise Corp." and "Best General Merchandise (USA)," a Korean corporation, Grip Toys, Inc., f/k/a "Mai, Ltd.," a Nevada corporation, Bertrand A. Levesque, a California citizen, Keith D. Nowak, a New Jersey citizen, Lieberman, Rudolph & Nowak, a New York partnership, Samuel Petrovich, a Wisconsin citizen, Thomas Meisenheimer, a Wisconsin citizen, Paul Moss, a Minnesota citizen, Paul Moss & Co., Inc., a Minnesota corporation, Robert C. Hooper, a California citizen, Steven Composto, a New York citizen, Forman Marketing & Sales Corp., a New York Corporation, Keith Andes, individually and d/b/a

Andes and Co., a Tennessee citizen, Andes America, Inc., a Tennessee corporation, Dayton Hudson Corporation, d/b/a "Target Stores," a Minnesota corporation, and John Does I–XX, non-Illinois citizens, Third–Party Defendants

and

Select Creations, Inc., a Wisconsin corporation, Counterdefendant.

PALIAFITO AMERICA, INC., an Illinois corporation, Plaintiff,

v.

DAYTON HUDSON CORPORATION, a Minnesota corporation doing business through Target Stores, a division of Dayton Hudson Corporation, Defendant and Third–Party Plaintiff,

v.

MANTAE AMERICA, INC., a/k/a Many Amazing Ideas, Inc., a New York corporation, Third–Party Defendant.

Nos. 91–C–1240, 92–C–214.

United States District Court, E.D. Wisconsin.

April 27, 1994.

Harold A. Laufer, Davis & Kuelthau, Milwaukee, WI, David Springer, John Lyons, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Paliafito.

Thomas G.A. Herz, Grant C. Killoran, Michael, Best & Friedrich, Milwaukee, WI, for Target.

David F. Loeffler, Greg Peters, Krukowski & Costello, Milwaukee, WI, for Lees, Loeffler.

Stephen P. Juech, Whyte Hirschboeck Dudek, Milwaukee, WI, for Nowak, Liberman & Nowak.

Gary L. Prior, McDermott, Will & Emery, Chicago, IL, for Trojan Luggage Co., Wilcox individually.

Annie Verdries, Lewis, D'Amato, Brisbois & Bisgaard, Costa Mesa, CA, for Chapter VII Trustee of estate of MAI, Duke Salisbury.

David P. Lowe, Jacquart & Lowe, Milwaukee, WI, for M.J. Korea Co., Ltd.

## DECISION AND ORDER

WARREN, District Judge.

From February 17–24, 1994, the Court held evidentiary hearings concerning its jurisdiction over MJ Korea;[1] MHW, Inc. ("MHW"); Longreen Toys, Inc. ("Longreen"); Min Suk Han; and Yang Ok Han (collectively, the "Han respondents"), pursuant to Paliafito's: (1) Emergency Motion for Entry of Second Supplemental Writ of Attachment, Temporary Restraining Order, Preliminary Injunction, and Appointment of

---

**1.** The Court herein employs the abbreviations used in previous orders.

Receiver to Perform Additional Duties, filed February 11, 1994; and (2) motion pursuant to Rule 25(c), Fed.R.Civ.P., for joinder of Min Suk Han, MJ Korea, MHW, and Longreen in entry of judgment against the Mantae defendants, filed February 22, 1994. Also before the Court are: (3) the Han respondents' request for a determination of foreign law;[2] (4) Paliafito's motion to admit PX 130, PX 327, PX 328, PX 329, PX 330, and portions of PX 184 into evidence;[3] (5) Paliafito's objection to the admissibility of HX 53 and HX 55[4, 5]; (6) Paliafito's motion

2. Pursuant to Rule 44.1, Fed.R.Civ.Proc., the Court would consider, *inter alia*, the Jin Ouk Kim Declaration attached to the Han respondents' motion and the Min Han Declaration attached to Paliafito's response in making any determination of Korean law necessitated by our resolution of the underlying motion. We find, however, that no such determination is necessary. *See infra* conclusions of law ("COL") 20–23.

3. The Han respondents object to the admission into evidence of PX 130 on the grounds that Paliafito has failed to demonstrate its relevance. The Court finds, however, that PX 130, comprised of telephone records authenticated by GTE California's custodian of records to be business records and received into evidence during the contempt hearing, may be relevant to whether MJ USA and Joy Lee shared an office in California. *See infra* findings of fact ("FOF") 95. Additionally, the Court notes, the Han respondents will not be prejudiced by its admission, in that telephone records uniformly qualify as business records pursuant to Rule 803(6), Fed.R.Evid. *See United States v. Briscoe*, 896 F.2d 1476, 1494–95 (7th Cir.1990) (affirming admission of authenticated telephone computer records into evidence), *cert. denied sub nom, Usman v. United States*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). As such, and because the Han respondents will suffer no prejudice, PX 130 is hereby admitted into evidence. The Han respondents also object to the admission into evidence of PX 184 at 17:24, an excerpt of the Joy Lee Deposition of September 9, 1993, on the grounds that Paliafito has failed to furnish a copy to counsel for the Han respondents, Paliafito has failed to demonstrate that Joy Lee's actions regarding ConPro were undertaken within the scope of her partnership with Min Suk Han and, hence, has failed to demonstrate its relevance, and that Paliafito's assertion that the Court has previously admitted portions of the deposition at the evidentiary hearing is false. The Court finds, however, that the entirety of PX 184 was marked and made available to the Han respondents, (3 Tr. 543:3–20 (Y. Han)), the excerpt may be relevant to precisely such a determination as whether Joy Lee was acting within the scope of the partnership, and the Court *did* accept other portions of the same transcript into evidence during the evidentiary hearing, (3 Tr. 544, 546:4–13, 1–17 (Y. Han)), implicitly pursuant to Rule 801(d)(2)(D & E), on grounds said statements constituted the admissions of a party opponent. As such, and because the Han respondents will suffer no prejudice, those portions of PX 184 that comprise excerpts of the Joy Lee Deposition of September 9, 1993 are hereby admitted into evidence. Finally, whereas the Han respondents do not object to and will suffer no prejudice by PX 327–330, said exhibits are hereby admitted into evidence.

4. Both Paliafito and the Han respondents call the exhibit containing the arrest warrant "HX 54." HX 54, however, comprises the Notice to Terminate Partnership. HX 55 comprises the arrest warrant.

5. At the evidentiary hearing, Paliafito objected to the admission into evidence of HX 53, an affidavit from MAI, Ltd.'s creditors' group representative, on the grounds that it contains inadmissible hearsay. The Court reserved ruling on its admissibility. (5 Tr. 1022:11–12.) The Han respondents now offer a properly authenticated original, and Paliafito again objects, on both hearsay and timeliness grounds. As to the hearsay issue, the Han respondents argued at the evidentiary hearing that such affidavits are generally admissible. We conclude otherwise. Once a plaintiff has demonstrated a *prima facie* case that jurisdiction exists through the allegations in its complaint, a defendant contesting jurisdiction may submit affidavits controverting the allegations. *See Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987). If a dispute of fact is thereby created, however, the defendant may either request adjudication of the issue of jurisdiction at a trial on the merits or may request that the Court conduct a pre-trial evidentiary hearing to resolve this issue, *see Crawford v. United States*, 796 F.2d 924, 929 (7th Cir.1986); *Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 & n. 2 (9th Cir.1977), at either of which the Federal Rules of Evidence, including the rule precluding hearsay, presumably (in the absence of any contrary authority offered by the Han respondents) apply. Here, the Han respondents consented to an evidentiary hearing on jurisdiction. As such, they cannot be heard to complain of its governing rules. Additionally, the Han respondents now argue that HX 53 falls into one of the catchall provisions. *See* Rules 803(24) and 804(b)(5), Fed.R.Evid. While we find that the purported evidence in the affidavit is material, however, the affidavit was plainly not the most probative evidence reasonably procurable by the Han respondents, some of whom themselves flew from Korea to the United States to participate in the evidentiary hearing. Particularly in light of the nature of the allegations contained therein, therefore, admission would not serve the general purposes of these rules and the interests of justice. We thus concur in Paliafito's first objec-

to strike the Han respondents' reply to Paliafito's proposed findings of fact and conclusions of law;[6] (7) Keith D. Nowak's and Lieberman & Nowak's objections to Paliafito's proposed findings of fact and conclusions of law;[7] and (8) Trojan's motion to strike certain of Paliafito's proposed findings of fact

tion, finding not only that the exhibit is comprised principally of inadmissible hearsay, but also that paragraphs two through six of the affidavit contained therein lack adequate foundation, and that paragraph six thereof is nothing more than a legal conclusion. As such, we decline to admit HX 53 into evidence and need not reach the issue of timeliness. On similar grounds, Paliafito objects to the admission into evidence of HX 55, an arrest warrant for Jerry Lee. As to the hearsay issue, the Han respondents argue that HX 55 comprises public records subject to the exception set forth in Rule 803(8). We concur. The arrest warrant, properly authenticated and adorned with the personal seal of a judicial official, plainly is constituted by nonevaluative "matters observed pursuant to duty imposed by law...." Fed.R.Evid. 803(8). Though the warrant is also adorned with the personal seals of both a prosecutor and a police officer, moreover, the warrant cannot reasonably be interpreted as the kind of police report normally excluded from the exception. As to the timeliness objection to HX 55, we find not only that the Han respondents substantially complied with the Court's scheduling orders by faxing the exhibit to the Court on March 4, 1994, and that the warrant at issue did not exist until 5:50 p.m. on February 25, 1994 (i.e., the morning of February 26, 1994 in the Eastern District of Wisconsin), many hours after the evidentiary hearing had ended, but also that it does not prejudice Paliafito, in light of the liberal briefing schedule. As such, HX 55 is hereby admitted into evidence.

6. On March 23, 1994, the Han respondents filed a reply to Paliafito's proposed findings of fact and conclusions of law. By letter of March 28, 1994, Paliafito moved to strike said reply on the grounds that it was filed without leave of Court. We agree. It is true that the Court did not forbid explicitly reply briefs in its oral briefing order of February 24, 1994—nor did it forbid explicitly cows from jumping over the moon. Nevertheless, neither occurrence was contemplated. The Court plainly directed only one round of simultaneous submissions, stating: "I want to receive from anybody at all that wants to submit any written materials in terms of brief on the jurisdictional question in 15 days." (5 Tr. 1042–43:25, 1–3.) Moreover, in response to John K. Lyons, Esq.'s question as to whether there would be an opportunity to respond, the Court stated: "No, I was going to ask for it simultaneously

and conclusions of law or for leave to file a response thereto.[8]

For the following reasons, the Court concludes, *inter alia*, that it has jurisdiction over MJ Korea, MHW, Yang Ok Han and Longreen.

[ ...] I don't see why that wouldn't work here." (5 Tr. 1043:12–16.) As such, the Han respondents' reply will not be considered. *See Select Creations, Inc. v. Paliafito America, Inc.*, 828 F.Supp. 1301, 1305 n. 1 (E.D.Wis.1992) (Court refused to consider Paliafito's supplemental proposed findings of fact).

7. Nowak objects to Paliafito's proposed finding of fact ("PPFF") 6, regarding a draft memorandum discussing how to insulate corporate assets via corporate structure and organization, on the grounds that it is: (1) irrelevant because not contemporaneous; (2) without foundation; (3) not a "blueprint for obfuscation;" and (4) incomplete and taken out of context. While we disagree with Nowak to the extent that we find that the memorandum was produced during a time period which may be relevant to jurisdictional issues such as successor liability, we agree that Paliafito's compounded assertions are without adequate foundation and that the memorandum does not necessarily evince an intent to obfuscate or defeat this Court's orders. As such, we will adopt PPFF 6 only to the extent supported by the evidence. (*See* FOF 16.) In light thereof, we find Nowak's fourth argument moot. Nowak also objects to PPFF 7, regarding a power of attorney faxed to Jong Ok Lee, on the grounds that it is vague, argumentative, without foundation, and irrelevant. We disagree. It is precise as to what action Nowak allegedly took and adequately descriptive of the contents of the document, (*see* PX 3), and hence plainly not vague or argumentative. As to foundation, Nowak makes no specific objection by which to render a determination. Finally, we find it may be relevant to jurisdictional issues such as successor liability. As such, we will adopt substantially PPFF 7. Nowak also objects to headings "C." and "D." as, *inter alia*, argumentative. We agree, and for the same reason decline to adopt any proposed headings by any participant in these proceedings.

8. Because we find that such findings may be relevant to the jurisdictional issue, the Court hereby denies Trojan's motion to strike certain of Paliafito's proposed findings of fact and conclusions of law. Because we further find, however, that Trojan is entitled to be heard on said proposed findings and conclusions, the Court hereby grants Trojan's motion to file a response thereto. Therein, Trojan objects, on various grounds, to PPFF 119–125, 129, 138–142, and 146. Said

## I. Findings of fact

### A. Participants and interested actors

1. Min Suk Han is a citizen of the Republic of Korea who resides in Seoul. He has never been to the U.S. except to testify at the evidentiary hearings. (2 Tr. 308, 315: 20–21, 2–4 (M. Han).)[9]

2. Min Suk Han is not related to Joy Lee or Jerry Lee, (2 Tr. 340: 10–14 (M. Han); HX 12, 13, 16), and had no acquaintance with them before April 1993. (2 Tr. 317–318: 15–25; 1–3, 13–19 (M. Han).)

3. Yang Ok Han is a Korean citizen who resides permanently in Seoul and temporarily has taken up residence in Chicago since early 1994. (3 Tr. 425–426: 20–21, 9–23 (Y. Han).)

4. M.J. Korea is a Korean corporation with its home office in Seoul. (HX 1.) It has an unincorporated branch office in Memphis, which was previously located in Los Angeles. The general manager of the U.S. branch of MJ Korea ("MJ USA") is Andy Oh, a Korean citizen who presently lives in Chicago. (1 Tr. 182, 188–189: 16–25, 5–20 (M. Han); 4 Tr. 791–92: 21–25, 1–4 (Y. Han).)

5. MHW is a Tennessee corporation owned entirely by Yang Ok Han. Its officers are Yang Ok Han and her husband. (3 Tr. 427–429, 436–437: 3–24, 25, 1, 19–25, 1–5 (Y. Han).)

6. Longreen is a California corporation with its office in Paramount, California. Its sole shareholder is Yong Su Paek,[10] a Korean citizen. Its agent for service of process is Raymond Aver, Esq., of Los Angeles. (PX 302; PX 303; 5 Tr. 952 (Paek).)

7. Neither MJ Korea nor MHW has an office in Wisconsin. (4 Tr. 791: 15–17 (Y. Han).) Longreen has no property in Wisconsin. (Tr. 792: 13–15 (Y. Han).) No proof was offered that Yang Ok Han has been to Wisconsin except for the occasion of her testimony at the hearings.

8. None of the foregoing persons or entities are yet parties to this litigation.

9. MAI, Ltd. was a Korean corporation. Its president was Jong Sik Lee ("Jerrold Lee" or "Jerry Lee"). (HX 39.[11])

10. MAI, Ltd. supplied Grip Toys products to, among others, MAI, Inc. ("MAI"), which imported Grip Toys for distribution in the United States. (3 Tr. 615: 5–19 (D. Kim).) MAI, Ltd. is one of the "Mantae defendants" (MAI, Ltd.; Puff Pac Production, Ltd.; Best General Merchandise; Miryoung ("Joy") Lee; and Jong Sik ("Jerrold") Lee) as defined in the First Supplemental Writ of Attachment, (PX 100), sued by Paliafito in its first amended counterclaim and third party complaint dated December 11, 1991. (4 Tr. 656: 1–14.)

11. Jong Ok Lee, Jerry Lee's brother, and Ho Seop Song, Joy Lee's brother, were the directors of Puff Pac Production, Ltd. (PX 18.)

### B. Paliafito sues the Mantae defendants

12. On December 11, 1991, Paliafito filed a first amended counterclaim and third-party complaint in this action, alleging that the

---

objections have been fully considered in making our findings.

**9.** References to the transcripts of the two proceedings essential to resolution of the motions before the Court are in the following format: ([volume] Tr. [first page]-[next consecutive page]: [line[s] from first page], [line[s] from next page] ([witness, if any]).) The February 11, 1994 teleconference transcript is designated Volume 0; the February 17, 1994 transcripts are designated Volume 1; the February 18, 1994 transcripts are designated Volume 2; the February 22, 1994 transcripts are designated Volume 3; the February 23, 1994 transcripts are designated Volume 4; and the February 24, 1994 transcript is designated Volume 5.

**10.** The relevant Han respondents' proposed finding of fact ("HPFF") lists Paek's first and middle names as "Jong Soo." (HPFF 5.) The corporate document referenced in HPFF 5, however, list Paek's first and middle names as "Yong Su." We employ the latter spelling to maintain uniformity.

**11.** At the evidentiary hearings, the Court sustained Paliafito's objection to the admission into evidence of HX 39 and HX 40 on the grounds of authenticity, but stated that said exhibits would be admitted upon compliance with Rule 902(3), Fed.R.Evid., namely by attachment of proper certificates of genuineness. (2 Tr. 636–78 (M. Han).) Whereas the Han respondents have since attached such certificates, said exhibits are hereby admitted into evidence.

Lees and MAI had breached their contract with and committed frauds against Paliafito, and violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.* (4 Tr. 656: 1–14.)

13. Paliafito also moved for preliminary writs of attachment and a preliminary injunction alleging that the Lees and MAI were remitting virtually all of the proceeds from the sale of Grip Ball back to Korea so that, even if Paliafito obtained a judgment, there would be no funds left in the U.S. to satisfy it. (4 Tr. 656: 15–23.) *See Select Creations, Inc. v. Paliafito America, Inc.,* 830 F.Supp. 1213, 1215 (E.D.Wis.1993).

14. This Court conducted evidentiary hearings on Paliafito's motion for four days in January and another six days in April 1992. (4 Tr. 656–57: 24–25, 1–2.)

15. On April 15, 1992, Puff Pac Production, Ltd. changed its name to "Mi Jong," and Jong Ok Lee and Ho Seop Song resigned as directors. (PX 18.)

16. On May 29, 1992, L. Michael Rudolph, Esq. provided Keith Nowak, Esq. with a draft memorandum regarding how to insulate corporate assets via corporate structure and organization. (PX 278.) The memorandum was produced from MAI's files. (PX 278 at Bates MAI1120.)

17. On June 12, 1992, Nowak faxed a power of attorney authorizing Jong Ok Lee to act on behalf of MAI in connection with setting up an Indonesian operation. (PX 3.)

18. Starting in June 1992, MAI transferred over $255,000 to the Indonesian operation. (PX 6.)

19. In one and one-half years, world-wide Grip Toys sales exceeded $84 million. (PX 53.)

20. The Lees and their businesses accumulated approximately $30 million in assets in Korea. (PX 15.)

21. MAI, Ltd.'s August 1992 financial statements showed fixed assets of more than $2.5 million, including real estate, vehicles and equipment. (PX 15.)

22. In the late autumn of 1992, Paliafito's motion for leave to file a second amended counterclaim to add, among other parties, MAI, Ltd., was pending. (4 Tr. 668–69: 21–25, 1–8.)

23. On December 1, 1992, the Court issued a decision and order requiring the Mantae defendants to make available sufficient assets to be attached and finding that Paliafito had established a likelihood of proving that the Mantae defendants had engaged in fraud and racketeering. (PX 32.)

24. After December 1, 1992, the Court ordered further briefing on the amount and timing of the attachment. (4 Tr. 681: 6–9.)

## C. The Lees establish MJ Korea

25. The Lees claim that on December 26, 1992, MAI, Ltd. filed bankruptcy in Korea. (PX 37.)

26. Korean law provides formal bankruptcy procedures similar to those in the U.S. When a Korean company goes into bankruptcy, that event is noted in the company's corporate registry. (2 Tr. 373: 10–13 (S. Kim).) No such notation appears in MAI, Ltd.'s corporate registry. (PX 16; PX 17.)

27. In Korea, however, formal bankruptcy procedures are generally not observed, especially by close corporations, because they are expensive and private arrangements with creditors are preferred. For the dissolution of corporations that become dormant in this fashion, Korean law thus provides a separate procedure. (2 Tr. 373–74: 10–25, 1 (S. Kim).)

28. On December 29, 1992, the Lees established MJ Korea. (PX 300 at ¶ 2; HX 1 at 2; PX 37; PX 40.)

29. On January 2, 1993, Jerry Lee sent a letter to Wil Van Bladel at Scatch Europe advising him of MAI, Ltd.'s purported bankruptcy and the movement of manufacturing to Indonesia:

As you have been informed by Joy, and as we have already explained to you while you were in Korea last month, all the manufacturing facilities under M.A.I. Korea is in the process of being transferred to the facilities in Indonesia. As of December 26, 1992, M.A.I. Korea has decided to file Chapter 11 which in views of others

may have either negative or positive implications. (PX 37.)

30. Jerry Lee also represented that the production of Grip Football was under Mi Jong Industry's control but that payment should be made to MJ Korea:

[T]he production and export of Grip Football has been completely under Mi Jong Industry's control from the initial stage. Thus, there will be no problem with the production and supply of Grip Football to Scatch Europe BV. Therefore, I would like to request the following amendments be made on L/C No. 8A/9250348:

The beneficiary of the L/C [should be changed] from M.A.I., Ltd. to M.J. Korea, Ltd.

(PX 37.)

31. MJ Korea apparently had the patent rights for Grip Ball in Korea. (4 Tr. 746: 3–5 (Y. Han).) Yang Ok Han did not know, however, how MJ Korea had obtained those patent rights. (4 Tr. 746: 13–15 (Y. Han).)

32. On January 13, 1993, Jerry Lee and a branch manager for the Korea Exchange Bank executed an Agreement and a D/A Account Receivable Transfer Agreement, (PX 316B(T)), whereby Jerry Lee assigned MAI, Ltd.'s and Mi Jong's right to collect the D/A owed to them by MAI. (PX 316B(T).) At the time of execution, the Lees' Korean companies owed the Korean banks $1 million and were owed $12 million by MAI. (2 Tr. 255: 2–9 (M. Han).)

33. On or about January 20, 1993, Joy Lee, on behalf of MAI, filed a UCC form with the California Secretary of State granting security interests in all of its assets to the Korea Exchange Bank, Jong Sik Lee, MAI, Ltd., and Mijong Industries, Inc. (PX 43.)

34. On February 8, 1993, Jacqueline Jean, on behalf of MAI, Ltd., sent a letter to Horisont regarding Grip Ball. (PX 41.) On February 12, 1993, Jerry Lee, on behalf of MJ Korea, sent a letter to Scatch Europe discussing future shipments of Grip Ball products. (PX 41.) The letterheads of PX 41 and 42 indicate that MAI, Ltd. and MJ

Korea had the same telephone number. (PX 41; PX 42.)

35. Min Suk Han denied that the Lees had established MJ Korea, (2 Tr. 396: 4–15 (M. Han)), contradicting statements in his criminal petition and his prior testimony. He explained that the statement contained in his criminal petition was based upon what Miung Lee, the former representative director of MJ Korea, had told him. (2 Tr. 396: 4–22 (M. Han).)

36. He also initially denied that the Lees transferred the Grip Ball business from MAI, Ltd. to MJ Korea. (1 Tr. 208: 1–24 (M. Han).)

37. According to Min Suk Han, office equipment was the only asset MJ Korea purchased from MAI, Ltd. (2 Tr. 379–380: 10–25, 1–17 (M. Han).)

38. He later stated that he had "absolutely no idea" whether the Lees had transferred the business from MAI, Ltd. to MJ Korea. (1 Tr. 210: 1–4 (M. Han).)

### D. The Court attaches the Mantae defendants

39. On February 19, 1993, the Court issued the Writ of Attachment, Preliminary Injunction, and Appointment of a Receiver which required, *inter alia*, that the Mantae defendants to deposit $8 million with the Receiver. (PX 61.)

40. On February 22, 1993, MAI filed a Chapter 11 bankruptcy petition, prepared and signed by Stroock & Stroock & Lavan ("Stroock"). (PX 63.)

41. On April 7, 1993, the Court entered the First Supplemental Writ of Attachment, Preliminary Injunction, and Appointment of a Receiver ("First Supplemental Writ") requiring the Mantae defendants (including MAI, Ltd.) to deposit $8 million with the Receiver and enjoining the Mantae defendants from transferring assets or taking other steps to hide or dissipate assets. (PX 100.)

### E. The Hans purchase MJ Korea

42. At the February 11, 1994 teleconference, Aver, counsel for MJ Korea, summa-

rized how the Hans became involved in the Grip Ball business:

> At any rate Miss Lee, M[i [12]]ung Lee ... brought Jerry Lee to Mr. Han with a business proposition. Apparently, their company, MJ Korea, was in need of some financial backing, and they explained to Mr. Han, who is a well known and well respected businessman in Korea, that if Mr. Han would pledge some of his real estate holdings on behalf of MJ Korea, that company could have the necessary funds to export toys to the United States and in return for that accommodation, all of the stock in MJ Korea would be transferred to Mr. Han.

(3 Tr. 473: 6–17 (Y. Han).) Min Suk Han had never met Joy Lee or Jerry Lee before this meeting in mid-April 1993. (2 Tr. 315, 317: 7–12, 9–14 (M. Han).)

43. Miung Hae Lee had sold insurance to Min Suk Han, (2 Tr. 316: 21–23 (M. Han)), and was a shareholder in MJ Korea. (2 Tr. 315: 7–12 (M. Han).) She is from Jerry Lee's hometown, but is not related to the Lees. (2 Tr. 316: 10–23 (M. Han).) Miung Hae Lee told Min Suk Han, *inter alia*, that Jerry Lee had received a governmental award for his high export volume. (2 Tr. 318: 4–12 (M. Han).)

44. Jerry Lee told Min Suk Han that MJ Korea had 1992 exports of $37 million and a pro forma for sales worth nearly $20 million. (2 Tr. 240: 4–8 (M. Han); PX 309.) Jerry Lee explained that MJ Korea was a good business with the opportunity for success. (2 Tr. 319: 18–24 (M. Han).) On the basis of

this information, Min Suk Han decided to invest in MJ Korea. (2 Tr. 320: 3–20 (M. Han).)

45. Before Min Suk Han invested in MJ Korea, however, Jerry Lee failed to disclose that: (1) he had personal financial problems; (2) MAI, Inc. had filed bankruptcy; or that (3) he and other corporations with which he was affiliated had been sued in the U.S. (3 Tr. 254–56, 293: 21–25, 9–14, 1–17, 9–19 (M. Han).)

46. Min Suk Han testified that he makes all of his investment decisions by himself; he does not have anyone investigate potential investments for him nor does he request, or obtain, information from any other source. (1 Tr. 194: 3–20 (M. Han).)

47. Prior to the stock purchase, however, Yang Ok Han had several meetings with Jerry Lee. (3 Tr. 473: 19–22 (Y. Han).)

48. The Hans decided to invest in MJ Korea, which they knew the Lees had established, (1 Tr. 207: 17–25 (M. Han)), based upon Jerry Lee's representations that: (1) MJ Korea [13] had raw and supplementary materials in Korea equivalent to 6 billion Won, (1 Tr. 213: 15–18 (M. Han)); (2) MJ Korea/MAI, Ltd. had good inventories in the U.S., (1 Tr. 213: 19–21 (M. Han)); (3) Jerry had $19 million in purchase orders, (2 Tr. 240: 7–8 (M. Han)); and (4) the Grip Toys business had been,[14] and would continue to be, profitable. (2 Tr. 319–20: 18–25, 1–20 (M. Han).) [15]

49. On April 21, 1993, the Hans purchased eighty-five percent of the shares of

---

12. Ms. Lee's first name is spelled variously throughout the record, but we employ "Miung" to maintain uniformity.

13. Notably, in the Notice to Terminate Partnership, (HX 54), Min Suk Han stated that Jerry Lee represented that the 6 billion Won of raw materials and the $12 million account receivable from MAI USA were assets of *MAI, Ltd.*

14. Min Suk Han testified that Jerry Lee told him that he had exported over $37 million in Grip Toys the previous year and, as a result, the Korean government had bestowed the "Copper Tower Medal of Honor" on him (2 Tr. 240, 318:4–8, 6–12 (M. Han)), and that he had made 3.8 billion

Won (approximately $3.8 million) in profits in 1992. (2 Tr. 240–41:7–25, 1–7 (M. Han).)

15. In the criminal petition that Min Suk Han filed against Jerry Lee, he stated:

> The defendants [Jerry Lee and Joy Lee] established M.J. Korea Ltd., which exports the aforesaid products [Grip Ball and Grip Football], at the end of December, 1992 and conciliated about the middle of March, 1993 by saying that there are raw and supplementary materials equivalent to six billion Wons [approximately $6 million] in Korea, goods inventories in U.S.A. and if bank debt of dishonored MAI Co., Ltd., in the amount of 694,000,000 [approximately $694,000] is settled, the company is very promising.

(PX 300 at 2 ¶ 2.)

MJ Korea. (2 Tr. 259–60: 25, 1–6 (M. Han); HX 2.) A fifteen percent interest was retained by Jong Ok Choi, a member of the original shareholder group. (1 Tr. 186–187: 18–21 (M. Han).)

50. The Hans paid approximately 42,500,000 Won (approximately $50,000) for the stock. (2 Tr. 260: 18–24 (M. Han).) Min Suk Han also pledged real estate titled in the names of family members to the Korea Exchange Bank to obtain short-term financing for MJ Korea. (2 Tr. 236–38: 10–25, 1–12, 4–12 (M. Han).)

51. Some of the stockholders from whom the Hans purchased MJ Korea previously had been employees of MAI, Ltd. (2 Tr. 395: 6–15 (M. Han).) Neither Joy Lee nor Jerry Lee, however, has ever been a named shareholder in or director or officer of MJ Korea, (2 Tr. 323–325: 25, 1–3 (M. Han); 4 Tr. 775–776: 13–25, 1–24 (Y. Han); HX 1; HX 3), or owned any of the properties securing the bank loans to MJ Korea. (2 Tr. 340: 1–9 (M. Han); HX 12; HX 13; HX 16.) While Min Suk Han asserted that neither Joy Lee nor Jerry Lee had a secret interest in MJ Korea, (2 Tr. 327: 3–7 (M. Han)), however, he did not know whether the stockholders were holding their stock for Jerry Lee. (2 Tr. 395–96: 25, 1–3 (M. Han).)

52. Min Suk Han knew that MJ Korea also had assumed certain liabilities of the Lees' other companies. He testified that the 694,000,000 Won debt originally owed by MAI, Ltd./Mi Jong [16] to the Korean Exchange Bank was now owed by MJ Korea. (2 Tr. 243–44: 10–25, 1–5 (M. Han).) Min Suk Han also knew, prior to investing in MJ Korea, that MAI, Ltd. had bounced checks in the past. (2 Tr. 319: 1–13 (M. Han).)

53. At a meeting of the board of directors of MJ Korea held on April 21, 1993, Min Suk Han was elected chairman and representative director. (HX 19; 2 Tr. 328: 8–19 (M. Han).)

54. Thereafter, the Hans, through MJ Korea, ostensibly conducted the Grip Toys business. (4 Tr. 824: 6–10 (Y. Han).)

55. After April 21, 1993, Yup Jong Chang was hired to manage MJ Korea and supervise the manufacture of Grip Toys. Chang reported to Min Suk Han. (2 Tr. 266: 8–19 (M. Han).)

56. According to Yang Ok Han, neither Joy Lee nor Jerry Lee transferred any money or property to MJ Korea after April 21, 1993. (4 Tr. 758, 766: 9–14, 6–9 (Y. Han); HX 44.)

57. After the Hans purchased MJ Korea, between a half and two-thirds of MJ Korea's employees were former employees of MAI, Ltd. (3 Tr. 609–10, 619: 15–25, 1–5, 18–22 (D. Kim).)

58. The Hans later pledged real estate valued at more than $10 million to secure a $7.3 million loan to MJ Korea from a consortium of five Korean banks. (2 Tr. 333: 6–18 (M. Han); PX 317; HX 10–11, 13–15, 17–18.)

### F. The Lees continue to influence MJ Korea

59. The Hans stated that Jerry Lee acted only as a consultant to MJ Korea after the Hans bought eighty-five percent of MJ's stock. (2 Tr. 264: 8–9 (M. Han); 3 Tr. 482: 15–20 (Y. Han).) Min Suk Han stated that, after April 1993, Jerry Lee did not work in the Grip Ball business. (2 Tr. 264: 10–12 (M. Han).) He also testified that, after April 1993, neither he nor anyone at MJ Korea ever had any discussions with Joy Lee concerning the Grip Ball business. (2 Tr. 264–66: 23–25, 1–25, 1–7 (M. Han).)

60. In asserting that the Lees had defrauded him, however, Min Suk Han stated: "[M]y daughter did whatever Joy told her to do in the United States. I, on the other hand, in Korea did whatever I was told by Jong Sik Lee." (2 Tr. 348: 7–10 (M. Han).)

---

**16.** In his criminal petition, Min Suk Han stated that the Lees had represented that MAI, Ltd. owed 694,000,000 Won to the Korean Exchange Bank. (PX 300 at 2 ¶ 2.) At the evidentiary hearing on jurisdiction, however, Min Suk Han stated that Jerry Lee had represented that "Mi Jong ... Trad[ing] Company," a company owned by Hee Suh Kim, Jerry Lee's nephew, owed the money to the Korea Exchange Bank. (1 Tr. 214–15:10–25, 1–4 (M. Han).)

61. The following evidence also contradicts the Hans' statements that the Lees were mere consultants to MJ Korea:

a. After a dinner with the Lees at the Hotel Intercontinental in Seoul at which Joy Lee promised Min Suk Han that their business partnership would yield him the "Gold Tower" award, Min Suk Han entered into a partnership agreement with the Lees relating to the sale of Grip Toys and other patented products. (PX 308(T).)

b. Jerry Lee maintained an office at MJ Korea to perform his consulting work. (2 Tr. 263: 1–4 (M. Han).)

c. Min Suk Han gave Jerry Lee money for purchases on behalf of MJ Korea. (2 Tr. 301–02: 21–25, 1 (M. Han).)

d. Daniel Kim testified that Jerry Lee gave instructions to MJ Korea's employees. (3 Tr. 611: 5–10 (D. Kim).)

e. Yang Ok Han wrote that she "provided answers" to Jerry Lee. (PX 151 at W276.)

f. In his criminal complaint, Min Suk Han accused Jerry Lee of malfeasance in performing various duties on behalf of MJ Korea, including shipping product to the U.S., (PX 300 at 2–3, ¶ 2), and spending MJ Korea's funds. (PX 300 at 3–4, ¶¶ 3–4.)

g. Jerry Lee corresponded with Joy Lee on topics such as creating MJ USA, setting up a company to do business in the U.S., selling products to customers and requesting particular requirements for those orders, and other day-to-day management concerns. (PX 110; PX 107.)

h. Yang Ok Han testified that according to Jerry Lee, he "was the most knowledgeable, most learned person about Grip Toys," (3 Tr. 482: 16–17 (Y. Han)), and that the Hans thus consulted him in connection with the Grip Toys business. (3 Tr. 482: 18–20 (Y. Han).)

62. On May 26, 1993, Jerry Lee sent a letter to Joy Lee on MAI, Ltd. letterhead and faxed from its office requesting the address for MJ USA. (PX 107.) Jerry Lee also stated that a $2 million standby L/C was ready. (PX 107.) The purpose of the $2 million L/C was to purchase the $12 million in U.S. inventory. (3 Tr. 486–87: 8–25, 1–12 (Y. Han).)

63. Yang Ok Han testified that the Hans had discussed the $2 million L/C and the establishment of MJ USA with Jerry Lee at or about that time. (3 Tr. 476, 486: 18–23, 1–7 (Y. Han).)

64. On June 2, 1993, Jerry Lee sent a letter to Joy Lee proposing that MJ USA finance an "agent" [17] company to "buy[ ] all the MAI items in stock" and sell the inventory to customers for several million dollars, and that he then use "about US $2,000,000 to take care of personal business." (PX 110.) Yang Ok Han testified that she discussed the substance of the first paragraph, setting up an agent company, with her father and Jerry Lee. (3 Tr. 509: 10–14 (Y. Han).)

## G. MJ Korea establishes MJ USA

65. In early June 1993, Yang Ok Han made her first trip to the United States, during which she visited Los Angeles and Trojan's facilities in West Memphis. (3 Tr. 487–88: 20–25, 1–20 (Y. Han).)

66. On June 9, 1993, MJ Korea established MJ USA at APAK Packaging, 706 Royal Avenue, Memphis, Tennessee. MJ USA is a branch of MJ Korea, not a separate corporation. Yang Ok Han was named branch manager. (PX 124; PX 125; PX 126; 1 Tr. 188–89: 8–25, 1–2 (M. Han).) [18]

67. Although the branch establishment documents list the 706 Royal Avenue address as MJ USA's address, the Hans testified that, until October or November 1993, the MJ USA branch was located in Los Angeles.

---

17. While the parties to the contempt proceedings, (FOF 122), dispute the appropriate translation of the corresponding Korean word, namely whether it is "front," (PX 110), or "agent" or "representative," (Tr. of December 14, 1993 at 418:4–8 (Joy Lee)), we decline to resolve that issue while the contempt motion remains *sub judice,* and herein employ "agent" only to avoid prejudice and maintain uniformity.

18. Kevin Lee prepared the confirmation of branch establishment, establishing MJ USA at 706 Royal Avenue in Memphis. (PX 125; 3 Tr. 503:1–4 (Y. Han).)

(1 Tr. 189: 18–22 (M. Han); 3 Tr. 466: 1–4 (Y. Han).)

68. Yang Ok Han, Andy Oh, and Daniel Kim are currently employees of MJ USA. (3 Tr. 466: 5–14 (Y. Han).)

69. The only products MJ USA sells are Grip Toys. (1 Tr. 190: 18–20 (M. Han).) MJ USA is supposed to take orders for Grip Toys and send them to MJ Korea, but none have been sent yet. (1 Tr. 190: 10–14 (M. Han).)

70. Joy Lee and MJ USA planned to set up ConPro, Inc. to sell Grip Toys in the possession of MHW to customers in the United States. (3 Tr. 528–29: 2–8, 7–12 (Y. Han).)

71. On June 11, 1993, Jerry Lee, on behalf of MAI, Ltd., and his nephew, Hee Suk Kim, on behalf of Mi Jong, designated Min Suk Han as the person to receive the $11 million in proceeds ($12 million less the $1 million owed by MAI, Ltd. and Mi Jong to the Korea Exchange Bank) from MAI's inventory in the United States pursuant to the January 13, 1993 arrangement with the Korea Exchange Bank. (2 Tr. 255, 258: 3–13, 7–22 (M. Han); PX 316A(T).)

## H. The Hans and the Lees enter a partnership agreement

72. Shortly before June 17, 1993, Joy Lee, Jerry Lee, Yang Ok Han, and Min Suk Han had dinner at the Hotel Intercontinental in Seoul. At this meeting, Joy Lee told the Hans that within one year she would be able to export at least $100 million in Grip Toys, thus enabling Min Suk Han to receive the "Gold Tower" award. (2 Tr. 346: 4–11 (M. Han).) Joy Lee stated that she would be able to sell Grip Toys to large U.S. customers such as Target, K Mart, and Toys R Us. (2 Tr. 346–47: 21–25, 1–6 (M. Han).) Joy Lee stated that Yang Ok Han was naive but that Joy Lee could make her into an excellent businesswoman in three or four months if she were sent to Los Angeles. (2 Tr. 347:

12–16 (M. Han).) They also discussed MAI, Ltd.'s business. (3 Tr. 474–75: 13–25, 1–4 (Y. Han).)

73. Prior to June 17, 1993, (2 Tr. 394: 1–20 (M. Han)), the Hans gradually discovered that Jerry Lee's representation that he had $19 million in purchase orders was false. (2 Tr. 343: 8–14 (M. Han); 4 Tr. 791: 7–14 (Y. Han).)

74. Were the Lees to have submitted false purchase orders to MJ Korea, the banks might have approved shipments on a D/A basis even though MAI had no customers to take the inventory. (2 Tr. 344–345: 15–25, 1–8 (M. Han); 404–405: 10–21, 13–21 (M. Han).)

75. Prior to June 17, 1993, the Hans also discovered the pendency of the Paliafito dispute in the U.S. (2 Tr. 401–02, 404: 24–25, 1–7, 20–21 (M. Han).) Min Suk Han explained:

> When I, after I found out that this was false I confronted Jerry Lee about this, and he explained, he said that the products with Paliafito was the matter was pending in the United States and he swear that he would not cause any damage and if he, if I financed, if I finance to solve problem, there would still be $11 million which can become the profit for me.

(2 Tr. 401–02: 24–25, 1–7 (M. Han).)

76. Yang Ok Han testified, however, that she did not hear about the Wisconsin litigation from Joy Lee. Joy Lee did tell her that MAI and Paliafito were involved in a lawsuit in New York, that MAI had won the case, and that the loser had appealed and therefore MAI had sought Chapter 11 protection. (4 Tr. 792–793: 19–25, 1–13 (Y. Han).) Yang Ok Han sent some documents from the Lees to her attorneys and was told the Lees had won the case. (4 Tr. 793: 19–25 (Y. Han).)

77. On June 17, 1993, Min Suk Han and the Lees entered into a partnership agreement ("the Agreement").[19] (HX 58; PX

19. The Han respondents and Paliafito dispute both the appropriate English translation and the legal character of the Agreement. The Han respondents' translation, for instance, is entitled "Business Cooperation Agreement." (HX 58.) Paliafito's translation is entitled "Partnership

Agreement." (PX 308.) Paliafito now concedes that the Korean title of the Agreement might as well be translated "Joint Venture Agreement" or "Joint Business Agreement." (Min Han Decl. at 1.) Whereas, however, the Han respondents themselves refer to the association contemplated

308(T); 2 Tr. 252: 6–14 (M. Han).) In it, they agreed to split the net profits from the Lees' patented and trademarked products three ways. (PX 308(T) at 4, art. 8, ¶ 1.) Under the Agreement, Jerry Lee was "responsible for production guidance and supervision of [MJ Korea]," (HX 58 at 3, art. 5(4)), and Joy Lee was "responsible for selling [Grip Toys] produced by [MJ Korea]" and "for storage and inventory control. . . ." (HX 58 at 3, art. 5(5).)

78. The products referred to in the Agreement related to Grip Toys. Under the Agreement and related documents, the Lees assigned MAI, Ltd.'s and Mi Jong's $12 million claim on MAI's inventory to Min Suk Han and promised to turn over to MJ Korea more than six billion Won in raw materials owned by MAI, Ltd. (2 Tr. 258: 7–20 (M. Han); PX 316A; PX 316B; PX 318; PX 319.) In the Notice to Terminate Partnership, Min Suk Han wrote:

When I and you, Lee Jong Sik and Song Miryoung, signed a Business Cooperation Agreement on June 17, 1993 to manufacture and sell toys and other products, I was told that M.A.I. Ltd., of which [Jerry Lee] was the representative director, had in stock a total of six billion Won of raw materials and other materials; and that as of November 30, 1992, M.A.I. Ltd., and Mijong Mulsan Co., Ltd., had the sum of US$12,137,596.80 . . . of claim payable by [MAI] for the products sold by them to [MAI] on D/A basis. . . .

In short, the gist of said agreements is that, as of June 17, 1993, M.J. Korea Ltd., secured raw materials and other materials in the value of approximately six billion Won, and that, as of November 30, 1992, M.A.I. Ltd. and Mijong Mulsan Co., Ltd. had a credit equivalent to approximately US$12,137,596.80, which was payable by [MAI], to said two companies for the products exported on D/A basis, and that said credit be collected and applied to the payment of the obligations to [the Korea Exchange Bank], and then said Bank should discharge the Keun-mortgage over the properties held by said Bank as a security, and that any amount of said proceeds remaining after such application be paid to Min Suk Han.

(HX 54 at 1.)

79. In their initial brief, the Han respondents represented that the Lees and Min Suk Han had never entered into a partnership agreement.

Discussions ensued between Min Suk Han, and Joy Lee and Jerry Lee to form a partnership agreement, separate from M.J. Korea, to engage in the import and export business; however, such a partnership was never formed.

(2 Tr. 233: 11–15.) Aver, counsel for the Han respondents, testified that he obtained this information from the Hans. (5 Tr. 1003: 14–25 (Aver).)

80. In Min Suk Han's criminal petition against Jerry Lee, (PX 300), however, Min Suk Han stated:

The plaintiff [Min Suk Han] who believed the defendants' saying agreed to do business in partnership with the defendant LEE, Jong Sik and SONG, Mi Ryeong [Joy Lee].

(PX 300 at 2 ¶ 2.)

81. When confronted with his criminal complaint at the hearing, Min Suk Han initially testified that he had never entered into a partnership with the Lees. (1 Tr. 215–16: 23–25, 1–9 (M. Han).)

82. Counsel for MJ Korea later stated, however, that the statement contained in the Han respondents' brief was incorrect and that Min Suk Han and Jerry Lee had entered into a partnership agreement. (2 Tr. 232–33: 20–25, 15–24.)

83. According to Yang Ok Han, the Agreement never became effective because Jerry Lee never contributed the promised capital. (4 Tr. 788: 2–5 (Y. Han).)

84. The partnership never had any bank account, phone number, office, letterhead, or

by the Agreement mainly as a "partnership," (HPFF 31, 48; HX 54; 2 Tr. 233:9–24; *but see* Post–Hearing Brief at 14 n. 7), and whereas, in any event, we need not thereby prejudice the Han respondents by drawing any conclusion as to the legal character of the Agreement from its name, we herein employ "partnership" to maintain uniformity.

capital. (4 Tr. 783–84, 786–787: 23–25, 1, 4–11, 16–22 (Y. Han).)

85. Yang Ok Han testified that the Hans. did not discover that MAI had filed bankruptcy until after they had entered into the partnership agreement. (3 Tr. 492: 7–11 (Y. Han).) On June 22, 1993, however, she received an opinion letter from her attorneys at Lee & Ko summarizing the research conducted by Morgan, Lewis & Bockius into whether: (1) MJ Korea could buy all of MAI's inventory without court approval; (2) the Korea Exchange Bank could acquire this inventory by foreclosing on its security interest and, in turn, sell the inventory to MJ Korea; and (3) there were any other ways to acquire the MAI inventory. MJ Korea's lawyers concluded that MJ Korea should obtain permission from the bankruptcy court to acquire the inventory. (PX 121 at 2.) The timing of the opinion letter suggests that the Hans knew about MAI's bankruptcy before the partnership agreement was signed. Yang Ok Han testified that Jerry Lee later explained that MAI had filed bankruptcy because of the Paliafito litigation. (3 Tr. 521–22: 24–25, 1–3 (Y. Han).)

86. Min Suk Han also testified that he had discussions with Jerry Lee and the Korea Exchange Bank on the topic of purchasing the assets of MAI. (2 Tr. 277: 16–19 (M. Han).)

87. On June 22, 1993, MAI received an MJ USA "Business Plan," (PX 118), purportedly prepared by MJ Korea, (3 Tr. 529: 21–24 (Y. Han)), but showing MAI, Ltd. fax traffic. The business plan contained projected sales of Grip Toys, (PX 118 at MAI 1120 13538), and discussed strategies for sales including "[c]ontinuation of advertisement in the U.S. markets, which has been done last 3 years," "[c]ontinuation of going to the TRADE SHOWS," "[t]horough follow-up with buyers with whom we had business in the last 3 years," and "[c]ontinuation of evaluating the new items under development." (PX 118 at MAI 1120 13539.)

88. On June 27, 1993, Yang Ok Han made her second trip to the U.S. (PX 119.) She visited Memphis and stayed with Joy Lee in Los Angeles. (3 Tr. 497–98: 19–25, 1–8 (Y. Han).) She also visited New York, where she had dinner with Keith Nowak, Ray George, and Joy Lee. (3 Tr. 469–70, 498: 24–25, 1–10, 2–4 (Y. Han).)

89. On June 28, 1993, Daniel Kim, working on behalf of MJ Korea,[20] (3 Tr. 593: 9–11 (D. Kim)), sent more D/A contracts for sales to U.S. customers totalling over $180,000. The D/A contracts named ConPro, Inc. and Vincent Jung/president as beneficiaries. (PX 122.)

90. MJ Korea sold Grip Toys to MAI. (2 Tr. 389–90: 9–25, 1–9 (M. Han); 4 Tr. 824: 6–15 (Y. Han).) In July or August 1993, MAI's payments for the goods stopped. (2 Tr. 392: 18–24 (M. Han).)

## I. Yang Ok Han buys Joy Lee's MAI stock

91. On July 8, 1993, Joy Lee sold her MAI stock to Yang Ok Han for $110,000. (PX 242; 4 Tr. 801: 5–22 (Y. Han).) Yang Ok Han obtained from MJ Korea the money used to purchase the stock. (3 Tr. 570: 17–20 (Y. Han).)

92. One of the reasons Yang Ok Han bought MAI was that she wanted her own distribution company in the U.S. for goods produced by MJ Korea. (4 Tr. 825–826: 21–25, 1–4 (Y. Han).) Min Suk Han hoped that the acquisition would solve the problem of MAI's irregular payment to MJ Korea for product shipped. (2 Tr. 387: 17–24 (M. Han).)

93. Yang Ok Han could not recall whether Joy Lee had told her of the Wisconsin lawsuit before the acquisition. (3 Tr. 542: 20–23 (Y. Han).) Joy Lee did tell Yang Ok Han that MAI was in Chapter 11 but that business continued as usual. (3 Tr. 540: 21–24 (Y. Han).) Yang Ok Han testified that she would not have made the purchase had she known there were "problems like this." (3 Tr. 541: 6–8 (Y. Han).)

94. In proceedings before the bankruptcy court on September 13, 1993, however, Joy Lee testified that she had "totally explained" to Yang Ok Han the Wisconsin litigation and

---

**20.** Kim had worked for Joy Lee in October 1992.

(3 Tr. 602:1–14 (D. Kim).)

the writ of attachment and injunction that the Court had entered. (3 Tr. 545: 4–13 (Y. Han) (quoting PX 188 at 53–54).) In fact, Yang Ok Han obtained an indemnification from Joy Lee "from and against any and all claims arising from Buyer's purchase of MAI stock . . . ." (PX 242 at § 11.6.)

95. Also on July 8, 1993, Vincent Jung signed the articles of incorporation establishing ConPro, Inc. (PX 128.) Thereafter, Joy Lee apparently conducted business out of an office in Walnut, California. (PX 130; PX 184 at 17: 24 (showing the same number as that indicated on GTE's telephone billing statement to ConPro, Inc.).) MJ USA apparently conducted its business out of the same office. (3 Tr. 572–73: 22–25, 1–18 (Y. Han).)

### J. Yang Ok Han and Joy Lee establish MHW

96. On July 14, 1993, Yang Ok Han established MHW under Tennessee law. (PX 327.)

97. Min Suk Han testified that Yang Ok Han established MHW as part of her responsibilities as manager of MJ USA. (2 Tr. 267–68: 24–25, 1–2 (M. Han).) Yang Ok Han testified, however, that MHW was Joy Lee's idea, (3 Tr. 432: 5–6 (Y. Han)), and that "Joy [Lee] took [Yang Ok Han] to the attorneys' office saying, telling [her] to establish MHW" (3 Tr. 427: 17–18 (Y. Han).)

98. MHW was established without being funded. (3 Tr. 429: 2–4 (Y. Han).) Later, however, Yang Ok Han invested in MHW $12,000 that she had earned at MJ Korea. (3 Tr. 429–31: 21–25, 1–13, 19–21 (Y. Han).)

99. Yang Ok Han owns all of the stock of MHW, (3 Tr. 428–29: 25, 1 (Han)), of which she is president. (3 Tr. 436–37: 25, 1–3 (Y. Han).) She and her husband, who is secretary, hold all the corporate offices. (4 Tr. 436–37: 25, 1–5 (Y. Han).)

100. MHW has one employee: Kevin Lee. (PX 32 at 65–66; 3 Tr. 432: 23–25 (Y. Han).) Kevin Lee, however, is not paid any salary or wages. (3 Tr. 438: 18–19 (Y. Han).) Joy Lee was never an MHW employee. (3 Tr. 437: 6–9 (Y. Han).)

101. MHW apparently shared an office in Walnut, California with ConPro, MJ USA, and Joy Lee. (3 Tr. 432, 433: 7–12, 3–8 (Y. Han).) Yang Ok Han entrusted the operation of MHW to Joy Lee and Kevin Lee when she was out of the country. (3 Tr. 438–39 (Y. Han).)

102. MHW maintained a bank account at California Korea Bank in Los Angeles. (3 Tr. 433: 9–16 (Y. Han).) Kevin Lee had authority to sign checks on behalf of MHW, (3 Tr. 438: 12–13 (Y. Han)), and was in charge of its business records. (4 Tr. 768: 3–6 (Y. Han).) According to Yank Ok Han, Joy Lee and Kevin Lee spent MHW's money "wantonly." (3 Tr. 438: 4–5 (Y. Han).)

103. The business of MHW was to store Grip Toys inventory in the U.S. (3 Tr. 433: 20–23 (Y. Han).) Yang Ok Han estimated that MHW had more than twenty containers in bonded customs warehouses in or around Memphis. (3 Tr. 433–34: 24–25, 1–17 (Y. Han).) She testified that she did not know whether inventory was located anyplace else in the U.S. (3 Tr. 436: 16–18 (Y. Han).)

104. MJ Korea consigned to MHW thirty-eight shipping containers of Grip Toys, now located in bonded warehouses in Long Beach, California; Memphis; and Seattle, pending payment of duties and demurrage in order to clear U.S. customs. (Daniel Kim Decl. (attachment); 1 Tr. 158–159: 24–25, 1 (Shaw); 3 Tr. 433–34: 24–25, 1–17 (Y. Han); 5 Tr. 922: 4–14 (S. George); 5 Tr. 1012: 8–18 (Oh).)

105. The warehoused inventory is MHW's sole asset. (3 Tr. 436: 8–10 (Y. Han).)

106. Until it clears customs, however, the inventory belongs to MJ Korea. (2 Tr. 262: 15–17 (M. Han); 3 Tr. 436: 5–6 (Y. Han).)

107. Yang Ok Han stated that she has no secret arrangement with the Lees to hold for them stock in MHW, (4 Tr. 755: 14–16 (Y. Han)), or property in Best General Merchandise; Grip Toys, Inc.; Marue Joint Stock Trading Company; or Chusik Hosea Kyongyong. (4 Tr. 771: 7–21 (Y. Han).)

108. Yan Ok Han stated that the Lees have never transferred any money to her. The only property she claims to have re-

ceived from Joy Lee was the stock of MAI, Inc., for which Yang Ok Han paid $110,000. (4 Tr. 756, 761: 2–5, 9–22: (Y. Han).)

109. In a letter to Wilcox, however, Yang Ok Han wrote that she "provide[d] answers for Jerry & my father" and "plann[ed] to continue our relationship until we reach our goal successfully." (PX 151 at W276.)

110. Later, at the evidentiary hearings, Yang Ok Han denied that she provided answers to Jerry Lee. (3 Tr. 533–34: 16–25, 1–14 (Y. Han).) When shown her contrary handwritten statement, she explained: "These are letters written by Joy Lee and told me to send—send them to Bob Wilcox." (3 Tr. 538: 3–4 (Y. Han).) She did not know whether the statements contained in the letters were true and added: "I just wrote whatever she told me . . . to write." (3 Tr. 556: 16–19 (Y. Han).)

111. Yang Ok Han also stated that she did not know that Wilcox was MAI's president until late September 1993. (3 Tr. 522: 13–24 (Y. Han).)

### K. Yang Ok Han returns Joy Lee's stock

112. On or around August 16, 1993, Yang Ok Han received a letter, (PX 204), from Lyons, counsel for Paliafito, enclosing the First Supplemental Writ. (3 Tr. 559, 562: 17–20, 3–6 (Y. Han).) Therein, Lyons asserted that because the sale of stock violated ¶ 15(d) of the First Supplemental Writ, Paliafito had moved to find Joy Lee in contempt and to declare the transfer void. The letter also asserted that Yang Ok Han was enjoined from changing the ownership interest in MAI, and stated that if she attempted another transfer, Paliafito would move to hold her in contempt. (PX 204.)

113. On August 19, 1993 *nunc pro tunc* August 13, 1993, the Court entered judgment against the Mantae defendants in the amount of $8 million for their willful default of the terms of the First Supplemental Writ. *See Select Creations*, 830 F.Supp. at 1229–33.

114. In a letter of August 23, 1993 to Yang Ok Han, David Loeffler, Esq., counsel for the Lees, advised that it was Joy Lee's position that the stock sale did not violate the Court's Order of April 7, 1993. (PX 205.) Loeffler did, however, urge Yang Ok Han to permit Joy Lee to return the stock certificates and corporate records to the United States pending resolution of their ownership. (PX 205.) Yang Ok Han returned the minutes book and corporate seal to Joy Lee to take to the U.S. (4 Tr. 805: 7–25 (Y. Han).)

115. In September 1993 Yang Ok Han signed documents to effectuate the return of the MAI, Inc. stock to Joy Lee because Joy Lee had threatened that Joy Lee would otherwise go to jail and Yang Ok Han was scared. (3 Tr. 57–71: 8–16, 3–11 (Y. Han).) Joy Lee did not return the $110,000 Yang Ok Han had paid for the stock. (3 Tr. 571: 12–17 (Y. Han).)

### L. The Hans discover the Lees' ongoing fraud

116. On September 20, 1993, Yang Ok Han discovered a letter that Jerry Lee had sent to Joy Lee on September 7, 1993. (3 Tr. 572, 573–74: 22–25, 24–25, 1–5 (Y. Han).) Therein, Jerry Lee stated that the Lees had exchanged "somewhat exaggerated information," had "failed to be absolutely honest to each other," and that if products shipped to the U.S. from Korea were not timely paid for, the collateral real estate would be "immediately put up for public auction," which could lead to a civil suit and "years of possible imprisonment." (HX 9.) Jerry Lee also stated that, if the debt was not repaid, he would "need to come back to the U.S. immediately and hide [him]self . . . ." (HX 9.) Jerry Lee also stated that he "oppose[d] [Yang Ok] Han's stay in the U.S. . . . ." (HX 9.)

117. Upon discovering the letter, Yang Ok Han faxed a copy to Min Suk Han in Korea. (3 Tr. 574: 2–5 (Y. Han).) Min Suk Han then confronted Jerry Lee with the letter. (2 Tr. 358: 18–20 (M. Han).) Jerry Lee stated that "the purpose of the letter was to give warning to his wife and it's different from facts." (2 Tr. 358: 22–24 (M. Han).) Min Suk Han then ordered an audit of MJ Korea's business records. (2 Tr. 359–60: 24–25, 1–3 (M. Han).) The audit revealed that Jerry Lee had embezzled money from MJ Korea. (2 Tr. 360: 13–17 (M.

Han).) Min Suk Han again confronted Jerry Lee, who begged for a period of a month and a half during which to compensate MJ Korea. (2 Tr. 360: 3–7 (M. Han).)

118. In October 1993 Min Suk Han filed a petition with the Seoul district prosecutor for the commencement of criminal proceedings against Jerry Lee and Joy Lee for embezzlement and fraud. (PX 300; 1 Tr. 198–99: 25, 1–2 (M. Han).) Min Suk Han also sent to the Lees a "Notice to Terminate Partnership." (HX 54.)

119. The Hans allege that they have been defrauded of more than $2 million by the Lees. (HX 54; 2 Tr. 300–01, 360: 24–25, 1–14, 13–17 (M. Han); 3 Tr. 571: 12–17 (Y. Han).) The Hans also risk losing more than $10 million in real estate which they pledged to secure credit for MJ Korea. (PX 317.)

120. On or about October 1, 1993, Oh started working as manager of MJ USA. (1 Tr. 182–83: 16–21, 10–11 (M. Han).) Min Suk Han chose him for that position. (1 Tr. 188: 13–15 (M. Han).) Oh conducts MJ Korea's business with money sent by, and reports to, Min Suk Han. (1 Tr. 183, 188: 8–9, 16–17 (M. Han).) Oh lives in Chicago. (1 Tr. 182: 25 (M. Han).)

121. Also on October 1, 1993, Oh called counsel for Paliafito and was informed that counsel would soon be travelling to Korea. (PX 321; 3 Tr. 586: 6–10 (Y. Han); 5 Tr. 1012–13: 8–25, 1–7 (Oh).) Oh informed Yang Ok Han about the call. (5 Tr. 1012: 4–6 (Oh).)

## M. Paliafito initiates civil contempt proceedings

122. On October 29, 1993, Paliafito filed its motion to hold the Lees, Wilcox, Trojan, MAI, and Loeffler in civil contempt of court for alleged violations of various provisions of the First Supplemental Writ. In December 1993 and January 1994, the Court held a nine days of evidentiary hearings on Paliafito's motion, currently *sub judice.*

123. David Lowe, Esq., counsel for the Han respondents, attended several days of the contempt hearings and reported what transpired to the Hans' Korean attorneys. (3 Tr. 558: 12–25 (Y. Han).)

124. On November 12, 1993, S.M. Kang faxed a letter announcing his appointment as president of MJ Korea. (PX 305.) Therein, he stated:

On this occasion I would like to express my hearty thanks for your courtesy *extended to our company for years* and sincerely hope friendly business connections be strengthened further again to our mutual benefit.

We also like to notify that Mr. Jerry Lee was resigned and left M J Korea Ltd. at the time of my appointment. We have heard that Ms. Joy Lee was also resigned from Many Amazing Ideas, Inc. in U.S.A. and you can recheck with Mr. Robert Wilcox, the president of MAI, Inc. if you have any question. As you know, we are the production and sales headquarter and MAI, Inc. is in charge of sales in U.S.A. This concludes that Mr. Jerry Lee and Ms. Joy Lee are not authorized to sell Grip Toys anymore.

We are very interest[ed] in re-expanding sales in Europe, so please let us know your comments.

(PX 305 (emphasis added).)

125. On December 2, 1993, a notice was published in *Dong-a Ilbo,* a Seoul daily newspaper, alleging that MAI, Ltd. became "DISHONOURED ON THE DATE OF DEC. 26, 1992," and requesting that creditors report their total credit to the representative of the creditors' group before December 8, 1993. (HX 40.)

126. On December 31, 1993, Lowe sent a letter to counsel of record and the Court, stating that he had been "retained to represent the interests of M.J. Korea, Ltd. and Mr. Han, Min Suk, its principal owner, in connection with efforts by parties to this litigation to obtain information relevant to the hearing on the motion for contempt filed by Paliafito America, Inc." (HX 59.) The letter explained that his clients were concerned about Paliafito's allegation that MJ Korea is controlled by or is a front for the Lees, and were ready to facilitate discovery. (HX 59.)

## N. The bankruptcy court authorizes an auction of MAI

127. On February 7, 1994 *nunc pro tunc* January 24, 1994, the United States Bankruptcy Court, Central District of California, entered an order in the proceeding *In re Many Amazing Ideas, Inc.*, LA93 15924 (Bankr.C.D.Cal.) (Greenwald, J.), authorizing Duke Salisbury, the MAI's interim Chapter 7 trustee, to auction MAI's assets on February 4, 1994. (PX 312; 1 Tr. 51: 13–16 (Salisbury).)

128. The property to be auctioned included the intellectual property rights to Grip Toys. (PX 323; 4 Tr. 655: 14–20 (Lyons).)

129. Prior to the auction, Salisbury knew that Paliafito held the view that any transfers of assets to MJ Korea through the sale of property at auction would violate the terms of the First Supplemental Writ. (1 Tr. 50–51: 22–25, 1 (Salisbury).)

130. At the January 24, 1994 hearing before the bankruptcy court, Salisbury obtained discretionary authority to reject any bid. (1 Tr. 54: 5–8 (Salisbury).) The auction order stated that:

> [I]n accepting or rejecting bids, the Trustee may exercise his discretion in light of the effect of orders issued by the District Court of Wisconsin, Case No. 91 C 1240 (the "Wisconsin Orders"), pending in Milwaukee. The Trustee in his discretion, may reject bids even if those [ ] bids are the highest bids for the items being auctioned. Nothing contained herein shall prejudice or otherwise affect any parties' rights or remedies pursuant to the Wisconsin orders or any other orders that may be issued by that Court.

(PX 312 at 2–3.)

131. Salisbury also agreed that the top three bids would be returned to the bankruptcy court for approval. (1 Tr. 54: 11–19 (Salisbury).) One purpose of the post-sale hearing was to protect Salisbury from potential liability for violating this Court's orders. (1 Tr. 54: 20–25 (Salisbury).)

132. Aver was present at the January 24, 1994 hearing and indicated to Salisbury that he was representing MJ Korea. (1 Tr. 61: 14–22 (Salisbury).)

133. Salisbury advertised the auction in *The New York Times, USA Today,* and *The Wall Street Journal* to achieve as much interest as possible and get the highest bid. (1 Tr. 76: 6–18 (Salisbury).)

## O. MJ Korea establishes Longreen

134. In January 1994 MJ Korea retained Aver in an effort to purchase the assets from the bankruptcy estate of MAI, Inc. (5 Tr. 985: 11–16 (Aver).) He read this Court's orders, then contacted Annie Verdries, Esq., counsel for the trustee, and told her that he had been retained by MJ Korea. (5 Tr. 985, 987: 17–23, 15–25 (Aver).)

135. Verdries told Aver about the Wisconsin litigation:

> I didn't think [MJ Korea] [was] going to be [allowed to bid]. And the reason for that is that I spoke to Ms. Verdries, and she explained to me in a brief a little bit about the litigation here in Wisconsin, and she said that Paliafito was watching over things very, very closely and that she didn't believe that MJ should bid at the auction or—because Paliafito would essentially block anything that MJ would try to do.

(5 Tr. 986: 6–13 (Aver).)

136. They also discussed setting up a new corporation as an alternative possibility. (5 Tr. 987: 2–14 (Aver).)

137. Yang Ok Han and Oh, in consultation with Aver, decided to organize Longreen Toys, Inc. (3 Tr. 447: 4–12 (Y. Han).) Aver explained that Longreen was incorporated as a measure to be taken in the chance that Paliafito would not consent to MJ Korea bidding at the auction. (5 Tr. 990: 5–20 (Aver).)

138. Aver testified that his clients never asked him to set up a front corporation for illegal or fraudulent purposes, and that he would not have done so if they had. (5 Tr. 1007–08: 22–25, 1 (Aver).)

139. Paek owns a Korean company with annual sales in excess of $60 million, (5 Tr. 949, 950: 8–10, 2–9 (Paek)), and asserts that he is in the U.S. to do his own business. (5 Tr. 968: 18–20 (Paek).)

140. According to Min Suk Han, however, Paek works for both MJ Korea and Min Suk Han personally. (2 Tr. 279: 6–15 (M. Han).)

141. Prior to coming to the U.S., moreover, Paek followed Min Suk Han's suggestion, (5 Tr. 958–59, 969: 23–25, 1–3, 5–10 (Paek)), that he contact Oh to recommend an attorney who could help him organize a corporation in the U.S. (5 Tr. 972–73: 23–25, 1–2.)

142. Paek knew that Oh had worked for Min Suk Han, (5 Tr. 958: 12–25 (Paek)), and was manager of MJ USA. (5 Tr. 973: 10–12 (Paek).)

143. Oh put Paek in touch with Aver. (5 Tr. 959: 12–14 (Paek).)

144. Min Suk Han sent Paek to the U.S. because Paek is "the person [Min Suk Han] trust[s] most." (2 Tr. 279: 4–5, 17–18 (M. Han).) Paek stated that he came to the U.S. at Min Suk Han's suggestion because he thought it was "a very good business opportunity." (5 Tr. 951: 2–15 (Paek).)

145. On January 30, 1994, Paek arrived in the U.S. (5 Tr. 951, 972: 16–22, 17 (Paek).) On the next day, he met with Aver and signed papers prepared by Aver relating to Longreen. (5 Tr. 951, 972: 23–25, 18–19 (Paek).)

146. Paek executed a certificate of incorporation, a consent resolution of the board of directors, and stock certificates. (HX 51; PX 302; PX 303; 5 Tr. 951–52: 23–25, 10–22 (Paek).)

147. On February 1, 1994, Longreen was incorporated under California law. (PX 302.) David I. Sunkin, an attorney in Aver's office, (Tr. 990–91: 21–25, 1–2 (Aver)), was Longreen's incorporator. (PX 302.)

148. Aver did not know about Paliafito's investigation before Longreen's articles of incorporation, public documents which list Aver as registered agent for service of process, were filed. (5 Tr. 1007: 3–16 (Aver).)

149. Aver had previously identified himself to Paliafito's counsel as MJ Korea's counsel, (5 Tr. 1007: 17–19 (Aver)), and never attempted to conceal the dual representation. (5 Tr. 1007: 20–22 (Aver).)

150. Lyons knew before the auction that Aver was MJ Korea's attorney. (4 Tr. 831: 6–10 (Lyons).)

151. Paek is the sole shareholder of Longreen. (5 Tr. 952: 23–34 (Paek).) According to Yang Ok Han, the Longreen stock is not being held secretly for the Lees. (2 Tr. 384–85: 25, 1–3 (M. Han). According to Paek, he has never met the Lees and has no plans to sell his stock to them. (5 Tr. 953: 9–11 (Paek).)

152. Paek was appointed president and chief financial officer, and Gil Kim was appointed secretary. (5 Tr. 955–56: 19–25, 1–3 (Paek).) Shirley George testified that she believed that business cards she had made for Toy Fair identified Paek as president of Longreen. (5 Tr. 899: 13–25 (S. George).)[21]

153. Also on or around February 1, 1994, Yang Ok Han called Charles Lee, her husband's cousin's husband and the manager of Seyang International at 6411 East Alondra Boulevard, Paramount, California, and asked one of his employees if Longreen could use Seyang's business address. (4 Tr. 637–38: 2–22, 1–6 (Y. Han).)[22]

154. The money used to capitalize Longreen came from MJ Korea. (5 Tr. 953: 12–14 (Paek).)

155. Min Suk Han sent approximately $2.5 million to MJ USA. He wanted Oh to use the money "to make [MJ Korea's] branch office, MJ branch office could have a stronger root, a good root in the United States and, therefore, will help the main office." (2 Tr. 279–80: 25, 1–13 (M. Han).)

156. The Han respondents' brief summarizes how Longreen was thereafter funded:

---

21. Yang Ok Han claims that she is neither an officer nor an employee of Longreen. (4 Tr. 638:13–16 (Y. Han).) She testified, however, that the reason she does not know much about Longreen is "[b]ecause all the matter [she] trusted to her attorneys." (3 Tr. 458:19–22 (Y. Han).)

22. Yang Ok Han testified that it was her idea to call Charles Lee and obtain a business address for Longreen. (4 Tr. 638:17–23 (Y. Han).)

Yong Su Paek is the owner of 100% of the issued and outstanding stock of Longreen. . . .

On or about February 2, 1994, Yong Su Paek loaned Longreen sufficient sums to participate at the Bankruptcy Court ordered auction of the assets of M.A.I.—U.S.A. in West Memphis, Arkansas. Mr. Paek borrowed the funds from M.J. Korea, and secured the borrowing with a pledge of his stock in Longreen. Longreen also guaranteed payment of the M.J. Korea/Paek loan, and collateralized its guaranty by granting M.J. Korea a security interest in all assets of Longreen.

(3 Tr. 457–58: 4–25, 1–8 (Y. Han).)

157. MJ Korea thus loaned approximately $2.5 million to Paek in return for a promissory note in that amount and interest at two points above prime. The note was secured by a written guaranty agreement which, in turn, was secured by a pledge of the Longreen stock. Longreen then borrowed the same funds from Paek pursuant to a similar promissory note. This arrangement was designed to maximize MJ Korea's rights and remedies in the event of a default. (HX 56 (Aver Decl. at ¶¶ 1–5); 5 Tr. 954: 18–20 (Paek).)

158. None of the capital used to start Longreen Toys came from the Lees. (4 Tr. 763: 21–25 (Y. Han).)

159. Paek opened a bank account, over which he has signing authority, at the Sanwa Bank in Los Angeles. (5 Tr. 964–965, 971: 24–25, 1–5, 25, 1 (Paek).)

160. Paek must get Oh's approval before spending the money. (2 Tr. 283: 11–18 (M. Han).)

161. Oh asserted that he has no instructions to instruct Paek. (5 Tr. 1017: 23–25 (Oh).) According to Min Suk Han, however, Paek reports to Oh. (2 Tr. 281: 20–24 (M. Han).)

162. Longreen's profits, moreover, are repatriated to MJ Korea. Paek testified that all of the income earned by Longreen (less operating expenses and Paek's percentage) goes to MJ Korea. (5 Tr. 969–70: 16–25, 1–3

(Paek).) The profit-sharing agreement is currently "being drawn." (5 Tr. 970–71: 25, 1–4 (Paek).)

163. In corporate loan documents, Longreen listed its address as 2622 West Peterson Avenue, Suite # 4, Chicago, Illinois, the same address used by MJ USA. (*See* Aver Decl. at Exh. 3 & 4.)

### P. Longreen buys MAI's assets at the auction

164. After preparation of the loan documents, Longreen retained Aver to assist in its effort to bid at the bankruptcy auction. (HX 56 (Aver Decl at ¶ 6).)

165. Prior to the auction, Paliafito's counsel discussed with MJ Korea's counsel the possibility of MJ Korea bidding at the auction. Paliafito told MJ Korea that although it had no objection to MJ Korea bidding at the auction, it would object to any transfer of assets to MJ Korea. (4 Tr. 832–33: 17–25, 1–3 (Lyons).)

166. Paliafito asked MJ Korea to provide documents substantiating MJ Korea's claim that it had no relation to the Lees. Paliafito also told MJ Korea that if it submitted the highest bid, it should appear before the bankruptcy court and produce evidence that it was not related to the Lees. (4 Tr. 833, 839–40: 8–14, 17–25, 1–3 (Lyons).)

167. On February 4, 1994, Salisbury conducted an auction of MAI's estate at Trojan's facilities in West Memphis, Arkansas. (1 Tr. 55: 1–3 (Salisbury).) The inventory is located in Long Beach, California; Memphis; Seattle; and West Memphis, Arkansas. (1 Tr: 55: 1–3, 17–10 (Salisbury); Daniel Kim Decl. (attachment).)

168. The Lees were not in control of MAI at the time of the auction. (5 Tr. 936–37: 4–25, 1–4 (S. George); HX 50.)

169. There were many people at the auction. (4 Tr. 837: 13–17 (Lyons).)

170. Four groups of bidders appeared. (1 Tr. 55: 16–24 (Salisbury).) One group comprised Aver, Yang Ok Han, and Daniel Kim.[23] (1 Tr. 58–59: 19–25, 1–12 (Salisbury);

**23.** During the February 11, 1994 teleconference,

Paliafito asserted that Joy Lee's nephew, Doh-

PX 314; 3 Tr. 597: 7–9 (D. Kim); 5 Tr. 996: 5 (Aver).) Another group comprised a single individual, Raymond E. Tiggert. (1 Tr. 55: 21–22 (Salisbury).) Another group, comprising Oh, Paek, and Jasper Jones,[24] appeared on behalf of Longreen Toys, Inc. (3 Tr. 566–67: 23–25, 1 (Y. Han); 3 Tr. 599: 15–18 (D. Kim); 5 Tr. 996: 9–12 (Aver).)[25] An unknown man represented the fourth bidder. (1 Tr. 55: 24 (Salisbury).)

171. Paek explained that he asked Oh to attend because Paek was unfamiliar with auctions in the U.S. and did not speak English well. (5 Tr. 957: 1–10 (Paek).)

172. The Longreen Toys group sat at the opposite side of the room from the MJ Korea group. (PX 314.)

173. No member of the MJ Korea group attempted to conceal themselves from Lyons at the auction. (4 Tr. 833–34: 23–25, 1 (Lyons).)

174. Salisbury received competing bids from, on one hand, Oh and Jones, on behalf of Longreen, and, on the other hand, Tiggert. (1 Tr. 64–65: 21–25, 1 (Salisbury); 4 Tr. 828–30: 23–25, 1–12, 1–12 (Lyons).)

175. The MJ Korea group did not bid. (1 Tr. 65: 2–3 (Salisbury).) Salisbury expected MJ Korea to bid and was disappointed that it did not. (1 Tr. 81, 97: 20–21, 17–19 (Salisbury).)

176. Jones, who registered as an agent for Longreen, submitted the highest bid of $600,000 (plus a $60,000 auctioneer fee). (1 Tr. 65–66: 18–25, 1–12 (Salisbury).)

177. Oh possessed envelopes containing Longreen's cashiers' checks. (4 Tr. 829: 13–21 (Lyons); 5 Tr. 965–66: 18–25, 1–3 (Paek).)

178. Oh tendered Longreen's cashiers' checks to the auctioneer to purchase the auctioned assets. (1 Tr. 93: 8–17, 7–9 (Salisbury); 5 Tr. 965–66: 6–25, 1–6 (Paek).)

179. To confirm its purchase, Longreen filled out an auction sheet, on which it listed its address as 6411 Alondra Boulevard, Paramount, California 90723 and telephone number as (310) 220–1161. (PX 313; 1 Tr. 65: 11–13 (Salisbury).)

180. Longreen, however, does not conduct any business from the 6411 Alondra location. (4 Tr. 6438: 7–12 (Y. Han).)

181. About ten minutes after the auction, Oh approached Salisbury regarding the intellectual property. (1 Tr. 66: 13–22 (Salisbury).) Salisbury asked him if he had any connection with the Lees or any entity connected with the Wisconsin litigation. (1 Tr. 66, 85, 86: 22–24, 2–7, 17–20 (Salisbury).) Oh replied: "You've got to be kidding." (1 Tr. 66, 86: 24–25, 21–23 (Salisbury).)

182. Salisbury did not, however, explain to Oh what he meant by "any person involved in the Wisconsin litigation," (1 Tr. 88: 19–24 (Salisbury)), and did not mention MJ Korea. (1 Tr. 86: 13–16 (Salisbury).)

183. At no time before or after the auction did anyone from the MJ Korea group disclose to Salisbury that they were related to or affiliated with the Longreen group. (1 Tr. 67: 1–6 (Salisbury).)

184. In light of this Court's orders, and the bankruptcy court's order, Salisbury knew that the identity of the bidder was at issue. (1 Tr. 107–08: 22–25, 1–7 (Salisbury).) Salisbury would have considered the bidder's identity and the facts indicating a relationship between the Longreen group and the MJ Korea group material. (1 Tr. 108: 9–14 (Salisbury).)

185. Salisbury testified that he believed he was "[a]ctively and consciously" deceived by the MJ Korea group's failure to apprise him at the auction that MJ Korea was related to Longreen. (1 Tr. 70–71: 23–25, 1–2 (Salisbury).) Salisbury explained:

yung Kim, was a member of the MJ Korea delegation at the auction. (O Tr. 7:6–14.) The person at the auction, however, was actually Daniel Kim, a different individual. (3 Tr. 591–592, 613–614:21–25, 1, 25, 1–5 (Kim).)

**24.** Paek testified that Aver, his attorney, retained Jones. (5 Tr. 958:21–22 (Paek).)

**25.** Salisbury did not know the identities of Oh and Paek, whom Salisbury indicated on PX 314 to be "X1" and "X2," until after the auction. (PX 314; 1 Tr. 58:4–16 (Salisbury).)

It was a deliberate deception. I knew that Mr. Aver was representing MJ Korea. At no time was it made known to me that the Longreen people were anything else but a distant, unrelated party, and I was very surprised to learn that—that Mr. Aver's firm had formed this corporation on the eve of the auction, that apparently the entire funding of the corporation was made by the Hans.

(1 Tr. 83–84: 22–25, 1–4 (Salisbury).)

186. Had Salisbury known of such an affiliation, he might not have acted differently, but would have filed a report of sale and an application for instruction setting forth what he knew with the bankruptcy court. (1 Tr. 67: 10–13 (Salisbury).)

187. No bankruptcy court order, however, expressly prohibited MJ Korea from bidding or from "causing another clean corporate entity to be organized to bid at the auction." (1 Tr. 76–77: 22–25, 3–6 (Salisbury).)

188. Agents registered to bid, moreover, were not required to disclose the identity of their principals. (1 Tr. 110–11: 16–25, 1–5 (Salisbury).)

189. According to Aver, it is not unusual to organize a new corporation to bid at a bankruptcy auction. (5 Tr. 991: 3–18 (Aver).) Aver explained that the corporate form is used to retain anonymity, limit liability, and maintain corporate distinctions. (5 Tr. 991: 12–16, 19–25 (Aver).)

190. At the time of the auction, moreover, Aver understood that no court order prohibited MJ Korea from loaning money to an individual to set up a new corporation to bid at the auction. (5 Tr. 994 10–17 (Aver).)

191. Aver assumed that Verdries knew about MJ Korea loaning money to an individual to set up a new corporation to bid at the auction because of their discussions. (5 Tr. 994: 18–23 (Aver).)

### Q. The bankruptcy court's post-sale hearing

192. Yang Ok Han and Aver appeared at the bankruptcy court hearing on the following Monday, February 7, 1994. (1 Tr. 69: 13–19 (Salisbury).) Salisbury was surprised

that Aver entered an appearance on behalf of Longreen. (1 Tr. 70: 1–3 (Salisbury).) This was the first time Aver identified himself as Longreen's counsel to anyone other than the Han respondents. (1 Tr. 70: 1–3 (Salisbury); 4 Tr. 840: 4–8 (Lyons); 5 Tr. 996, 1000: 7–22, 10–15 (Aver).)

193. No court order, however, required Aver to tell Paliafito that he had been retained by Longreen. (4 Tr. 840: 13–17 (Lyons).)

194. Bankruptcy Judge Greenwald stated that if Paliafito had a problem with the auction, it should bring a motion. (5 Tr. 996–997: 7–13, 13–20 (Aver).)

195. Paliafito did not, however, seek to upset the auction in the bankruptcy court. (4 Tr. 839: 10–13 (Lyons).)

196. Salisbury did not file a report of sale, and the bankruptcy court concluded the hearing. According to Salisbury, the bankruptcy court reaffirmed that nothing in its orders was intended to compromise any right that Paliafito might have under this Court's orders. (1 Tr. 71: 19–23 (Salisbury).)

### R. Longreen conducts business

197. On February 8, 1994, Lowe wrote to Paliafito's counsel "on behalf of Longreen Toys, Inc." Lowe's letter indicated that Longreen intended to hold counsel for Paliafito and Paliafito liable for any damages sustained as a result of interference with the disposition of inventory already "committed for sales to customers." (*See* Paliafito's Emergency Motion at Exh. D.)

198. If either Wilcox or Ray George (MAI's pre-petition vice president for sales and post-conversion employee) had orders in hand prior to the auction, they never informed Salisbury. If they had, Salisbury might have been able to fill the orders and place the proceeds into the Chapter 7 estate. (1 Tr. 63–64: 12–25, 1–3 (Salisbury).)

199. Except to certain large customers, however, Salisbury had rejected sales not for cash. (1 Tr. 96–97: 21–25, 1–6 (Salisbury).) Shirley George controlled orders and shipment. Copies of all bills of lading were sent to Salisbury, and she tried to fill every order

before February 4, 1993 to benefit the estate of MAI. (5 Tr. 881–82, 896: 18–23, 11–23, 3–17 (S. George).) In fact, Salisbury, whom the bankruptcy court had ordered not to accept any purchase orders which required shipment after February 4, 1994, even directed Shirley George to accept one such order for approximately $166,000. (5 Tr. 905–06, 924: 20–25, 1–17, 14–17: (S. George); HX 50 at 3.)

200. Thus, it appears, the orders received by Longreen immediately after the auction either had been rejected by Salisbury or obtained at Toy Fair. (5 Tr. 902: 10–25 (S. George).)

201. Salisbury, however, never authorized Wilcox or Ray George to turn over to someone else orders that he had rejected. (1 Tr. 112: 5–8 (Salisbury).)

202. After the auction, Paek requested that Wilcox and the other MAI employees continue to work for Longreen, at least temporarily. (5 Tr. 981–82: 24–25, 1–2 (Paek).)

203. Wilcox, Shirley George, and all of the Trojan employees now work for Longreen. (5 Tr. 878, 897: 21–22, 3–6 (S. George); 5 Tr. 966: 7–17 (Paek).)

204. Shirley George, however, does not know Paek, Longreen's president and sole shareholder. (5 Tr. 890: 12–14 (S. George).) At the evidentiary hearing, she could not name any officer, director, or shareholder of Longreen. (5 Tr. 899: 8–10 (S. George).)

205. As to who hired her, Shirley George said: "To be honest, I am not sure, I just, once it had been bought and put on Longreen payroll, Mr. Wilcox is the one who informed us we would continue." (5 Tr. 890: 16–19 (S. George).)

206. When asked if Wilcox had said she should work for Longreen, Shirley George responded: "[I]t more or less just continued on once [Longreen] took over." (5 Tr. 890: 24–25 (S. George).)

207. Ray George, Wilcox, Wiener Weitzman, and Trojan now work for Longreen. (5 Tr. 927: 6–23 (S. George).)

208. Longreen rents Trojan's warehouse in West Memphis, Arkansas. (5 Tr. 890: 8–11 (S. George).)

## S. Paliafito sues the Han respondents

209. On February 10, 1994, Paliafito filed its Emergency Motion for Entry of a Second Supplemental Writ of Attachment, Preliminary Injunction and Appointment of a Receiver. Therein, Paliafito requested that the Court appoint a receiver to take custody of assets purchased at the MAI auction and enjoin the Han respondents from selling Grip Toys products.

210. On February 11, 1994, Paliafito served its emergency motion on Aver, Longreen's registered agent. (PX 328.)

211. During a teleconference held on February 11, 1994, the Court informed the parties that it would hold an evidentiary hearing on the issue of jurisdiction over the Han respondents. (PX 306.)

212. MJ Korea, Longreen, Min Suk Han, and Yang Ok Han appeared specially during the teleconference, objecting to the exercise of personal jurisdiction. (0 Tr. 13–14, 17: 20–25, 1–18.) [26]

213. On February 14, 1994, the Korean Tax Office issued a certificate of cessation regarding MAI, Ltd. (HX 39.)

214. During the week of February 14, 1994, Yang Ok Han and Wilcox went to the 1994 Toy Fair together. (3 Tr. 445: 5–8 (Y. Han).)

215. Oh also went to Toy Fair. (3 Tr. 450: 2–3 (Y. Han).)

216. Joy Lee was also at Toy Fair. (4 Tr. 653: 17–18 (Y. Han).)

217. Wilcox was at Toy Fair in connection with Grip Toys. (3 Tr. 447: 19–21 (Y. Han).)

218. Wilcox spoke to Grip Toy sales representatives at Wiener Weitzman, the independent sales organization used by Longreen. (3 Tr. 448–49: 24–25, 1–3 (Y. Han); 5 Tr. 928: 18–23.)

219. Shirley George testified that she had to have a Longreen business card made for Wilcox. (5 Tr. 899: 13–18 (S. George).) The

26. Paliafito later named MHW specifically as an additional respondent. (COL 16 n. 3.)

business card did not show, however, any title or office with Longreen. (5 Tr. 900: 1–4 (S. George).) Longreen paid his expenses. (3 Tr. 448: 21–23 (Y. Han).)

220. From February 17–24, 1994, the Court held an evidentiary hearing on the issue of jurisdiction over the Han respondents.

221. The Court held that the Hans and their witnesses would not, by their attendance at the evidentiary hearing on jurisdiction, be subject to personal service. (3 Tr. 463–64: 4–19, 11–17.)

222. On February 20, 1994, Paliafito served its motion and memorandum pursuant to Rule 25(c), Fed.R.Civ.P., on Oh by personally delivering copies to Hyungjoo Paek, Oh's fourteen year-old daughter, at Oh's residence in Chicago. (PX 322.)

223. On February 21, 1994, Paliafito served Longreen with its Rule 25(c) motion and memorandum by delivering copies to the offices of Aver, Longreen's registered agent. (PX 324.)

224. On March 4, 1994, Paliafito served its Rule 25(c) motion and memorandum on Yang Ok Han, president of MHW, director and officer of MJ Korea, and an individual, by personally handing copies to her at her residence in Glenview, Illinois. (PX 329.)

225. On March 9, 1994, Paliafito served its Rule 25(c) motion and memorandum on G. Robert Morris, MHW's registered agent, by personally delivering copies to his office. (PX 330.)

## T. Grip Toys inventory in the U.S.

226. Wilcox told James Shaw, an accountant retained by Salisbury, during the course of the latter's administration of MAI, that MJ Korea or MHW may have brought trademarked Grip Ball inventory valued between $2 and $10 million into the U.S. (1 Tr. 125–26, 127–28, 136: 10–25, 1–15, 14–25, 1–9, 1–4 (Shaw).) [27]

227. Before the auction, Shaw discussed this inventory with Shirley George, then a Trojan employee and later an employee of Longreen. (1 Tr. 133: 13–24 (Shaw); 5 Tr. 929: 2–6 (S. George).) Shirley George told Shaw that the U.S. Customs Service had been sending bills to MAI for this inventory even though the importer was MHW. (1 Tr. 133, 156: 15–24, 18–21 (Shaw).) [28] Shirley George told Shaw that approximately thirty-eight containers were under the control of customs, most of which were located in and around Memphis, while the rest were located in Seattle or elsewhere on the West Coast. (1 Tr. 134: 19–25 (Shaw); 5 Tr. 918–19: 20–25, 1–11 (S. George).)

228. As Shirley George was about to work through some documents with Shaw relating to this inventory, Wilcox walked in and asked her what she was talking about. Shirley George told him that they were going over the containers of inventory. Wilcox said: "[W]e've already talked about that. You and I have already discussed that, we don't need to talk about that anymore." (1 Tr. 153: 15–17 (Wilcox).) [29]

229. At the time, Wilcox was having "preliminary discussions" with MJ Korea regarding employment with MJ Korea if it pur-

---

**27.** Yang Ok Han confirmed that such inventory existed and was worth several millions of dollars. (3 Tr. 576:3–12 (Y. Han).)

**28.** Shirley George did not keep copies of the customs bills, which Shaw testified was unusual. (1 Tr. 135, 155–56:11–17, 25, 1–3 (Shaw).) She apparently forwarded them all straight to the customs brokers. (1 Tr. 135:15–17 (Shaw); 5 Tr. 920:8–23 (S. George).) Some were given directly to the trustee by MAI personnel and some were sent to the attorney retained by the bankruptcy estate to handle the customs matter. (1 Tr. 159:7–12 (Shaw).) Based upon Shaw's discussions with MAI's former administration and his review of its records, it appeared that MAI had paid the customs duties on goods brought into the U.S. by MHW, (1 Tr. 155:8–24 (Shaw)), when MAI needed the goods and was directed to pay the customs duties. (1 Tr. 155, 159:8–14, 18–23 (Shaw).)

**29.** It is unclear whether Wilcox was referring to, in addition to himself, Shirley George or Shaw. Shirley George testified that she had answered Shaw's questions freely and without interference, (5 Tr. 944:8–25 (S. George)), and Wilcox *had* previously discussed the inventory with Shaw. (1 Tr. 150–51, 152–53:19–25, 1–19, 23–25, 1 (Shaw).)

chased MAI's business. (1 Tr. 72: 17–24 (Salisbury).)

230. When Oh, who also met Shirley George while she was working for MAI, asked her for information concerning the thirty-eight containers, Wilcox told her to provide Oh with whatever information he needed. (5 Tr. 926–27: 18–25, 1–2 (S. George).)

231. During the February 11, 1994 teleconference, Aver stated that he had no knowledge of inventory other than that located in Los Angeles and at APAK Packaging, 706 Royal Avenue, Memphis, Tennessee. (PX 306; O Tr. 52, 59, 69: 15–25, 2–19, 15–21 (Aver).)

232. At the evidentiary hearing, however, the Hans stated that MJ Korea brought Grip Toys inventory into the U.S. and that such inventory was currently located in bonded warehouses under the control of the U.S. Customs Service. (2 Tr. 261–62: 18–25, 1–17 (M. Han).) Yang Ok Han testified that twenty or more containers were currently under the control of customs in and around Memphis. (3 Tr. 433–34: 24–25, 1–17 (Y. Han).)

233. MJ Korea actually brought into the U.S. forty-five containers of inventory, twenty of which are located in Long Beach, California and Seattle. (Daniel Kim Decl. (attachment).)

234. Currently, MJ Korea is doing business with PTKSS, the Indonesian Grip Toys operation. Min Suk Han knows that Jong Ok Lee, Jerry Lee's brother, owns and operates this business. (2 Tr. 399: 10–25 (M. Han).)

235. In the past, MJ Korea has shipped product to U.S. customers, such as Toys R Us, directly from Korea. (5 Tr. 934: 3–15 (S. George).)

## II. Conclusions of law

### A. Standard for jurisdiction

1. It is well-settled that "a court has no power to adjudicate a personal claim or obli-

gation unless it has jurisdiction over the person of the defendant." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110, 89 S.Ct. 1562, 1569, 23 L.Ed.2d 129 (1969).

■ 2. Before a federal court can acquire personal jurisdiction, however, a form of court process must be served in a manner authorized by law and a determination must be made that requiring the person to respond in the forum is consistent with due process. *Brunswick Corp. v. Suzuki Motor Co., Ltd.*, 575 F.Supp. 1412 (E.D.Wis.1983) (Reynolds, C.J.); *Delgado v. Sheriff of Milwaukee County Jail*, 487 F.Supp. 649 (E.D.Wis.1980) (Reynolds, C.J.).

3. This Court is empowered to resolve conclusively the question of jurisdiction based upon the evidence presented during the February 17–24, 1994 hearings on Paliafito's emergency motion for a second supplemental writ and its Rule 25(c) motion. *See Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 & n. 2 (9th Cir.1977).[30]

■ 4. The standard is straightforward: Paliafito must prove that jurisdiction exists by a preponderance of the evidence. *See CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986) (citation omitted); *Data Disc*, 557 F.2d at 1285.

### B. Bases for jurisdiction

5. Paliafito asserts five bases for personal jurisdiction over the Han respondents, namely pursuant to: (1) Rule 25(c), Fed.R.Civ.P., arising from the Han respondents' liability as successors in interest to the Mantae defendants; (2) the reverse alter ego doctrine; (3) Rule 71, Fed.R.Civ.P., and general equitable principles; (4) Rule 65, Fed.R.Civ.P., and the Court's inherent equitable powers to enforce its orders against nonparty aiders and abettors; and (5) the Federal Receivership Statute, 28 U.S.C. § 754.[31]

---

**30.** The Han respondents did not object to, and participated in, the evidentiary hearings on jurisdiction. As such, the Court may resolve conclusively the issue of jurisdiction. *See Crawford*, 796 F.2d at 929.

**31.** Paliafito does not argue that the Court can exercise jurisdiction over the Han respondents based on the Agreement. As such, much of the Han respondents' argument is inapposite. (*See* Post–Hearing Brief at 14–16, 18–20.)

6. For the following reasons, the Court concludes that Paliafito has: (1) met its burden with respect to the first basis, as to MJ Korea, MHW (and thus Yang Ok Han, MHW's alter ego, (COL 81)), and Longreen; (2) met its burden with respect to the second basis, as to MHW, Yang Ok Han, and Longreen; (3) met its burden with respect to the third basis, as to MJ Korea, MHW, Yang Ok Han, and Longreen; (4) failed to meet its burden with respect to the fourth basis; and (5) met its burden with respect to the fifth basis, as to MJ Korea, MHW, Yang Ok Han, and Longreen.

### 1. Rule 25(c) and principles of successor liability

7. Paliafito argues that the Han respondents are personally subject to the jurisdiction of this Court under Rule 25(c), Fed. R.Civ.P., and the substantive principles of successor liability because the Lees, judgment debtors, transferred their Grip Toys business to MJ Korea and the Han/Lee partnership in an effort to escape liability and because the transfer effected a "mere continuation" of the Lees' business.

8. Except as to Min Suk Han, the Court agrees.

### a. Successor liability and jurisdiction

9. In *Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc.*, 566 F.2d 8 (7th Cir.1977), *cert. denied sub nom., Beck v. Morrison Pump Co., Inc.*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978), the Seventh Circuit summarized the traditional rule of successor liability:

> The well settled rule of American jurisdictions ... is that a corporation which purchases the assets of another corporation does not, by reason of succeeding to the ownership of property, assume the obligations of the transferor corporation....

Exceptions to this rule exist where (a) the purchasing corporation expressly or impliedly agrees to assume the liabilities of the seller, (b) the transaction amounts to a consolidation or merger of the two companies, (c) the purchasing corporation is merely a continuation of the selling corporation, or (d) the transaction is entered into fraudulently to escape liability.

*Id.* at 24–25; *accord Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325–26 (7th Cir. 1990); *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir.1977).

■ 10. If a court has personal jurisdiction over the predecessor in interest, once successor liability is established, personal jurisdiction over the successor in interest necessarily exists. *See City of Richmond, Va. v. Madison Management Group, Inc.*, 918 F.2d 438, 454 (4th Cir.1990); *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1262–63 (Fed.Cir.1985); *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir.1982) ("any other ruling would allow corporations to immunize themselves by formalistically changing their titles"), *aff'd sub nom., Pallas Shipping Agency, Ltd. v. Duris*, 461 U.S. 529, 103 S.Ct. 1991, 76 L.Ed.2d 120 (1983). This is so because the acts of the predecessor in interest are imputed to the successor. *See Madison Management*, 918 F.2d at 454 (" '[t]he great weight of persuasive authority permits imputation of a predecessor's actions [for purposes of personal jurisdiction] upon its successor whenever forum law would hold the successor liable for its predecessor's actions' " (citation omitted)).[32]

### b. Rule 25(c)

11. Rule 25(c), Fed.R.Civ.P., is the procedural vehicle by which to bring a successor defendant formally before the Court. We

---

**32.** Without this rule, any defendant could, as a practical matter, unjustly avoid liability by transferring its interests to an entity beyond the court's jurisdiction. As the Federal Circuit stated in *Minnesota Mining:* "Were this not so, the owners of property could merely transfer legal ownership of the assets from one shell corporation to another in a different jurisdiction, putting a party whose initial suit satisfied the jurisdictional requirements to the immense burden of chasing the involved assets from courtroom to courtroom." *Id.* at 1263. *See also Moody v. Albemarle Paper Company*, 50 F.R.D. 494, 497 (E.D.N.C.1970) (aggrieved party, having met jurisdictional requirements as to named party, "should be allowed to pursue his alleged claims for relief against the party defendant even though his course of pursuit may lead him through the dark and dismal forest known to all as the corporate reshuffle").

conclude that Paliafito has complied with the requirements of Rule 25(c) as to, and has thus properly hailed into Court, all of the Han respondents except Min Suk Han.

■ 12. Rule 25(c) enables a party to a lawsuit to substitute or join a person or entity to whom a defendant's interests have been transferred. Rule 25(c) states:

In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

Fed.R.Civ.P. 25(c).

■ 13. As set forth below, the evidence shows that, during the pendency of this action, the Lees and MAI, Ltd., named defendants, transferred their Korean Grip Toys business to MJ Korea, which they set up to escape liability, and that they consolidated their interests in a partnership with Min Suk Han. The record also shows that MJ Korea later transferred a portion of the business to MHW (and, hence, MHW's alter ego, Yang Ok Han) and Longreen, entities created by MJ Korea and Min Suk Han in an effort to place the interests beyond the reach of Paliafito.

33. *See* Fed.R.Civ.P. 4(h)(1).

34. We need not, and thus decline to, address the Han respondents' argument that Paliafito's service on Oh's *fourteen-year old daughter was insufficient as to MJ Korea.* The fact that Paliafito served Yang Ok Han, a director of MJ Korea, (HX 1), with its Rule 25(c) motion and memorandum is sufficient to bring MJ Korea before the Court. Rule 4, Fed.R.Civ.P., states that service of a summons (and a Rule 25(c) motion) may be made upon a domestic or foreign corporation, among other methods, pursuant to the law of the state in which the district court is located. *See* Fed.R.Civ.P. 4(h)(1) (incorporating Rule 4(e)(1), Fed.R.Civ.P.). Section 801.11(5)(a), Wis.Stat., states that a foreign or domestic corporation may be served "[b]y personally serving the summons upon an officer, *director*, or managing agent of the corporation ... either within or without this state." Wis.Stat. § 801.11(5)(a) (emphasis added).

35. The Han respondents object to Paliafito's allegedly untimely and surreptitious joinder of MHW. (Post–Hearing Brief at 2 n. 1, 4 n. 5.) In light of the facts, however, that Paliafito's emergency motion named the other Han respondents

14. Accordingly, the Court concludes that the Han respondents are "transferees in interest" as defined in Rule 25(c).

15. A Rule 25(c) motion must be served in accordance with Rule 25(a) which states:

The motion ... shall be served on the parties as provided in Rule 5, and upon persons not parties in the manner provided in Rule 4 for the service of summons, and may be served in any judicial district.

Fed.R.Civ.P. 25(a).

16. The record demonstrates that Paliafito personally served its Rule 25(c) motion on:

(1) Longreen, by delivering a copy to the office of Aver, Longreen's registered agent, (FOF 223); [33]

(2) MJ Korea, by serving Yang Ok Han, MJ Korea's director, (FOF 224), and by leaving copies of the motion with Oh, the manager of MJ USA, (FOF 222); [34]

(3) MHW, by serving Yang Ok Han, MHW's president, and by delivering copies to Morris, MHW's registered agent, (FOF 224, 225); [35] and

(4) Yang Ok Han, by personal service. (FOF 224.) [36]

17. Paliafito did not serve its Rule 25(c) motion on Min Suk Han.[37]

and "any of their affiliates, and persons and entities in active concert or participation with them," and that Paliafito could not have known precisely MHW's role prior to the evidentiary hearings, we find nothing improper about Paliafito now specifically naming MHW.

36. The Han respondents argue that none of the authority presented supports application of the doctrine of corporate successor liability to Yang Ok Han as an individual. (*See* Post–Hearing Brief at 21 & n. 10.) We concur. *But see Tift v. Forage King Industries, Inc.,* 108 Wis.2d 72, 322 N.W.2d 14 (1982) (fact that *predecessor* was sole proprietorship held irrelevant to application of principles of corporate successor liability); *Fish v. Amsted Industries, Inc.,* 126 Wis.2d 293, 376 N.W.2d 820, 824 (1985) (apparently approving *Tift*). The argument is, in any event, of little moment; Yang Ok Han is subject to personal jurisdiction as MHW's alter ego. (COL 81.) *See Panther Pumps,* 566 F.2d at 24–25 (individual held liable as alter ego of successor corporation).

37. Paliafito asserts that at the time of filing its proposed findings of fact and conclusions of law, it was still attempting to serve Min Suk Han.

18. Accordingly, the Court concludes that all of the Han respondents except Min Suk Han have been served in accordance with Rule 25 and thus properly have been hailed into the Court.[38.]

19. Because Rule 25(c) is a procedural rule and does not affect the substantive rights of the parties, however, the Court must apply the substantive law of successor liability to determine whether jurisdiction exists over any of the Han respondents. *See Minnesota Mining,* 757 F.2d at 1263–64; *Panther Pumps,* 566 F.2d at 24–28.

### c. Choice of substantive law

20. Because successor liability is a "question of traditional tort law," *see Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir. 1977), the Court, sitting in Wisconsin, must apply Wisconsin choice of law rules in determining which substantive law should be applied.

21. According to Paliafito, Wisconsin choice of law rules mandate that Wisconsin substantive law, which follows the traditional rule of successor liability, be applied.

22. According to the Han respondents, Korean law governs the issue of successor liability,[39] and is narrower than the traditional rule. Korean law, they argue, only recognizes successor liability in four instances: (1) merger; (2) consolidation; (3) transfer of business with the continuous use of transferor's trade name; and (4) succession or legal inheritance. (Jin Ouk Kim Decl. at 2.)

23. We agree with Paliafito, and thus apply Wisconsin substantive law.

24. As we have previously stated, Wisconsin applies the "center of gravity" or "grouping of contacts" doctrine to tort claims in the event of a conflict. *See Select Creations,* 828 F.Supp. at 1354 (citations omitted). Under this doctrine, the Court analyzes five factors: (1) predictability of results; (2) maintenance

Paliafito now argues that because it has served Oh, Min Suk Han's representative, and Yang Ok Han, Min Suk Han's daughter, the Court should, pursuant to *Leach Co. v. General Sani–Can Mfg. Corp.,* 393 F.2d 183, 185–86 (7th Cir.1968), conclude that Paliafito has brought Min Suk Han before the Court "by serving the persons and entities dominated and controlled by him." (PCOL 13 at n. 5.) We disagree. In general, "service on a foreign corporation cannot be had by service on a wholly-dominated subsidiary, where the corporate separation, although formal only, is real and not fictitious." *Id.* at 186 (relying on *Cannon Mfg. Co. v. Cudahy Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925)). *See also Beightol v. Capitol Bankers Life Ins. Co.,* 730 F.Supp. 190 (E.D.Wis.1990 (Reynolds, J.). In *Leach,* the Seventh Circuit seemingly recognized an exception to the general rule in affirming the district court's denial of the appellant principal corporation's motion to dismiss for lack of jurisdiction on the grounds that the appellant's shell corporation was really its agent. *Id.* at 186. In that case, the appellant's shell corporation retained appellant's company car; group life, hospitalization, and car insurance programs; and financial status; and, perhaps most importantly, received letters concerning its agency to obtain distributors for the appellant. *Leach* at 186. That is, the entities "[did] not observe even the form of corporate separateness." *Id.* Our situation is dissimilar. First, there is no issue of *corporate* separateness here. Min Suk Han is not a corporation, and Paliafito has not shown that he is MJ Korea's alter ego. In any event, we have already found effective service on MJ Korea through service on Yang Ok Han, MJ Korea's

director. (COL 16.) Second, Paliafito has not shown conclusively that either Oh or Yang Ok Han was authorized to act as a general agent for Min Suk Han, as an individual, despite some evidence that suggests that each may have acted at various times on his behalf, either as an individual or as a director shareholder of MJ Korea. As such, the Court concludes that Paliafito has not made effective service on Min Suk Han, over whom the Court thus can acquire no personal jurisdiction pursuant to Rule 25(c).

**38.** The Han respondents argue that Paliafito failed effectively to serve them, and, in any event could not have done so pursuant to Rule 4(f), Fed.R.Civ.P., or Wis.Stat. § 801.05, and in accordance with due process. (Post–Hearing Brief at 7–9.) As noted above, however, service effectively was made pursuant to Rule 25 on all but Min Suk Han. So doing, Paliafito did not rely on extraterritorial service. Our resulting jurisdiction, moreover, is not subject to either the limitations of the Wisconsin long-arm statute or the minimum contacts doctrine. *See Explosives Corporation of America v. Garlam Enterprises Corporation,* 817 F.2d 894, 906 (1st Cir.1987); *Minnesota Mining,* 757 F.2d at 1262–63.

**39.** We note, however, that while the Han respondents argue that Wisconsin choice of law rules mandate that Korean law should be applied to the issue of liability pursuant to the Agreement, (Post–Hearing Brief at 14–15), they fail to offer any parallel argument favoring the application of Korean law to the issue of successor liability. (*See id.* at 16.)

of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Id.* at 1354–55 (citations omitted).

25. These factors favor applying Wisconsin substantive law, which follows the traditional rule of successor liability. *See Leannais,* 565 F.2d at 439 (applying Wisconsin law).

26. First, the traditional rule is more predictable, being a "well settled" principle of American jurisprudence. *See Panther Pumps,* 566 F.2d at 24 (citations omitted). Second, application of the traditional rule will maintain the international and interstate order by making it more difficult for wrongdoers to use the corporate form to commit fraud and escape responsibility for their misdeeds. Third, because the traditional rule is widely followed, the Court has a substantial body of caselaw to guide it in applying the rule to the present facts. Fourth, the forum's governmental interest will be advanced; by adhering to the traditional rule, the integrity of our orders, and the ability of plaintiffs here to obtain redress for injuries, more readily will be protected. Fifth, the traditional rule is a better rule of law than that advanced by the Han respondents, which would seemingly permit the use of fraudulent transfers and shams to escape liability.

27. Accordingly, the Court will apply the traditional rule of successor liability.

### d. Panther Pumps

28. *Panther Pumps* is the controlling precedent governing whether the Han respondents succeed to the liabilities of the Lees and their Korean companies under Rule 25(c) and principles of successor liability. In short, the *Panther Pumps* court held that where interests have been transferred by a defendant to another person or entity rendering the transferee liable under principles of successorship liability, joinder is proper. *Id.* at 22–28.[40] Because *Panther Pumps* is dispositive of Paliafito's 25(c) motion and successor liability claims (and hence jurisdiction) as to MJ Korea, MHW (and Yang Ok Han, as MHW's alter ego) and Longreen, its facts are set forth below.

29. In *Panther Pumps,* Beck, the controlling shareholder of the original defendant, Hydrocraft, against which an injunction preventing the sale of infringing products and a $150,000 judgment had been entered, had secretly transferred all of Hydrocraft's assets to a newly established alter ego corporation, Universal, through which infringing product was sold. *Id.* at 10–11, 18.

30. Upon discovering the secret transfers and sales, the plaintiff had requested, and obtained, an order to show cause directing Beck to appear to show cause why he should not be held in contempt of court for violating the district court's injunction. *Id.* at 11–12.

31. Prior to the contempt hearing, the plaintiff had moved under Rule 25(c) to substitute or add Beck and Universal as defendants to the action (and hence the judgment)

---

**40.** Paliafito argues that joinder is mandatory under *Panther Pumps.* Although that court opined, *in dicta,* however, that Rule 17(a), Fed.R.Civ.P., in conjunction with Rule 25(c), operated to require substitution pursuant to the latter, *Panther Pumps,* 566 F.2d at 23; *accord Trombino v. Transit Casualty Company,* 110 F.R.D. 139, 147 (D.R.I.1986); it subsequently assumed, "as prior courts have assumed, that application of Rule 25(c) to the substitution of a transferee is discretionary." *Panther Pumps,* at 23. In fact, the Seventh Circuit has recently reiterated that "substitution of a party under Rule 25(c) is within the discretion of the trial court." *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 743 (7th Cir.1985). As such, we find that joinder pursuant to Rule 25(c) remains committed to our discretion. *See, e.g., McComb v. Row River Lumber Co.,* 177 F.2d 129 (9th Cir.1949); *Luxliner*

*P.L. Export Co. v. RDI/Luxliner, Inc.,* 13 F.3d 69, 71 (3d Cir.1993); *National Independent Theater Exhibitors, Inc. v. Buena Vista Distribution Co.,* 748 F.2d 602, 610 (11th Cir.1984); *FDIC v. Tisch,* 89 F.R.D. 446, 448 (E.D.N.Y.1981). It is thus "within the power of the Court to continue the action in its original posture, to order substitution of the party to whom interest has been transferred, or to join the transferee as a party." *Tisch,* 89 F.R.D. at 448 (relying on *E.I. duPont de Nemours & Co. v. Lyles and Lang Construction Co.,* 219 F.2d 328 (4th Cir.1955); *Sun–Maid Raisin Growers v. California Packing Corp.,* 273 F.2d 282 (9th Cir.1959)). *See also Hilbrands v. Far East Trading Company, Inc.,* 509 F.2d 1321, 1323 (9th Cir.1975). We make this determination by considering how the conduct of the litigation will be most facilitated. *Television Reception Corp. v. Dunbar,* 426 F.2d 174 (6th Cir.1970).

on the grounds that, by reason of the fraudulent transfers, Beck and his alter ego were transferees, and successors, in interest to the judgment debtor. *Id.* at 12, 22. Although it is unclear in the Seventh Circuit's opinion, the plaintiff apparently never had served Universal with its 25(c) motion and thus never properly brought Universal before the Court. *Id.* at 23 ("[t]he district court's order to show cause was directed *only* to Beck; it did not bring Universal before the lower court") (emphasis in original). *See also Minnesota Mining,* 757 F.2d at 1263 n. 13 (Fed.Cir.1985) ("[a]ppellants [out-of-state corporate successors] rely on the holding in *Panther Pumps* ... that Universal ... could not be added (under Rule 25(c)) as a successor in interest, as support for their position that appellants could not be added in the present case.... [t]he difference between the two cases is that Universal ..., unlike appellants, was never served and therefore never before that district court"). Accordingly, the district court denied the plaintiff's motion, and the Seventh Circuit affirmed, with respect to Universal. *Id.* at 23.

32. The district court, exercising what it perceived as its "great deal of discretion" under Rule 25(c), *id.* at 16, had also denied the plaintiff's motion to add Beck. The district court had rested its exercise of discretion on its view that the constitutional requirement of due process mandated that Beck have the opportunity to contest the original charge of patent infringement before imposing liability. *Id.* at 24.

33. The Seventh Circuit vacated the district court's order and held that the district court had abused its discretion. The Seventh Circuit stated that the district court had misperceived the allegations in the plaintiff's motion. In its motion, the plaintiff had charged Beck with acts giving rise to successor liability, not with the acts giving rise to the original liability under the judgment. Thus, because Beck had had an opportunity to contest the facts relating to successor liability, he had not been denied due process. *Id.*[41]

34. The Seventh Circuit then independently examined whether Beck was liable as a successor in interest. Applying the traditional rule and exceptions, the court concluded that Beck had succeeded to the liabilities of Hydrocraft because his conduct satisfied the third and fourth exceptions: (1) he had merely continued Hydrocraft's business through his alter ego company; and (2) he had transferred Hydrocraft's assets to escape liability. *Id.* at 28.[42]

### e. Application of the traditional rule

35. Paliafito argues that the evidence shows that the Han respondents are liable as successors in interest under the third and fourth exceptions to the traditional rule, namely because: (1) the business operated by MJ Korea, the Han/Lee partnership, MHW, and Longreen is the mere continuation of the predecessor Mantae defendants' business; and (2) the creation of MJ Korea, and the Lees' subsequent transfer of the Grip Toys business to it, was undertaken fraudulently to escape liability. *See Panther Pumps,* 566 F.2d at 25.[43]

---

**41.** *Accord Explosives Corporation of America v. Garlam Enterprises Corporation,* 817 F.2d 894, 905 (1st Cir.1987) (citing *Panther Pumps,* at 23–24); *Crucible, Inc. v. Stora Kopparbergs Bergslags AB,* 701 F.Supp. 1157, 1170 (W.D.Pa.1988) ("joinder is fully consistent with [the successor's] procedural due process rights") (citing *Minnesota Mining,* at 1264). *But see Alfadda v. Fenn,* 1993 WL 526065, *3 (S.D.N.Y.1993) ("[i]f the underlying merits had already been reached, an objection to Rule 25(c) substitution would more plausibly raise due process issues").

**42.** The Court recognizes, and the Han respondents make considerable issue of the fact, (Post–Hearing Brief at 10), that the *Panther Pumps* court found that the district court did not have personal jurisdiction over Universal, the entity

used by Beck to receive the transferred assets. It is apparent, however, that the reason the court so found was that the plaintiff never served Universal with its Rule 25(c) motion. (COL 31.) Here, by contrast, Paliafito has served its 25(c) motion and memorandum on MJ Korea, MHW, Yang Ok Han and Longreen. Nothing more is required under 25(c).

**43.** Contrary to the Han respondents' assertions, (Post–Hearing Brief at 24), the evidence also suggests that MJ Korea may be liable as a successor under the first exception, express or implied assumption of liability. It appears, for instance, that MJ Korea may have assumed the liabilities of the Lees' Grip Toys businesses, MAI, Ltd. and Mijong Industries. Min Suk Han testified that he knew, before he purchased the stock of MJ

36. The Court will analyze the exceptions in reverse order.

### i. Fraudulent purpose exception

37. The evidence establishes that the Lees created, and subsequently transferred their business to, MJ Korea fraudulently to escape liability to Paliafito.

38. On December 1, 1992, the Court issued a decision and order granting Paliafito's motion for a writ of attachment and requiring the Lees and their companies to deposit assets with the court-appointed receiver. (FOF 23.) On December 26, 1992, MAI, Ltd., the Lees' primary manufacturing operation, (PX 53), purportedly went into bankruptcy. (FOF 25.) [44] Three days later, on December 29, 1992, MJ Korea was established, purportedly owned by former MAI, Ltd. employees. (FOF 28, 51.) [45]

39. The Hans admitted that the Lees established and controlled MJ Korea. (FOF 35, 60, 61.) [46]

40. Other evidence supports the conclusion that the Lees created MJ Korea as a vehicle to continue their operations unimpaired:

a. On January 2, 1993, Jerry Lee (supposedly not involved in MJ Korea) instructed customers to switch a letter of credit from MAI, Ltd. to MJ Korea because "the production and export of Grip Football has been completely under Mi Jong Industry's [a company purportedly owned by Jerry Lee's nephew, (1 Tr. 214–15: 19–25, 1–4 (M. Han)) ] control from the initial stage." (FOF 29, 30.)

b. MJ Korea inexplicably obtained the Korean patent for Grip Ball. (FOF 31.)

c. The Lees assigned a $12 million account receivable due from MAI, an asset owned by MAI, Ltd. and Mijong Industries, to secure the repayment of Jerry Lee's $1 million loan to the Korea Exchange Bank and the balance, $11 million, to Min Suk Han to fund MJ Korea. (FOF 32, 71.)

d. Jerry Lee conducted business on behalf of MJ Korea in February 1993 and used the same telephone number that MAI, Ltd. (which, at the time, was supposedly defunct) was using. (FOF 34.)

e. Some of the purported shareholders of MJ Korea were former MAI, Ltd. employees. (FOF 51.)

f. Between a half and two-thirds of MJ Korea's employees were former MAI, Ltd. employees. (FOF 57.)

g. The Hans recognized that MJ Korea was the Lees' business. (FOF 42, 47, 48.)

41. Given the Lees' past corporate shell games, (FOF 9–11, 15, 18, 28), the sworn admissions of the Hans, and the evidence of the involvement of the Lees and their businesses with MJ Korea, the Court concludes that the Lees created MJ Korea fraudulently to escape liability to Paliafito. [47]

---

Korea, that MJ Korea was responsible to the Korea Exchange Bank for a debt of at least 694,000,000 Won owed by MAI, Ltd. and Mijong Industries. (FOF 52.)

**44.** At the time, the Lees knew that Paliafito had named MAI, Ltd. as a defendant in their second amended counterclaim, which Paliafito previously had sought leave to file. (FOF 22.)

**45.** Min Suk Han did not know whether the purported stockholders of MAI, Ltd. held their interests for the Lees. (FOF 51.)

**46.** The Han respondents' later attempts to distance themselves from their admissions reinforces the conclusion that the Lees established and controlled MJ Korea. (FOF 35.) Min Suk Han, for example, tried to distance himself from his sworn admission that the Lees established MJ Korea on the basis that he obtained this information from Miung Lee, a former named shareholder of MJ Korea. (FOF 35.) Rather than negat-

ing the fact that the Lees established MJ Korea, however, it reveals direct evidence from Miung Lee, a person with personal knowledge, that the Lees established MJ Korea and used nominal shareholders to conceal their control over it.

**47.** Citing *Armour–Dial, Inc. v. Alkar Engineering Corp.*, 469 F.Supp. 1198 (E.D.Wis.1979) (Gordon, J.), the Han respondents argue that the fraudulent purpose exception applies only to a transfer that renders the seller insolvent and unable to meet its obligations to creditors. (Post–Hearing Brief at 28.) We disagree. As to such a transfer, *Armour–Dial* actually implies, in *dicta*, only that it is, without more, sufficient basis for successor liability. *See id.* at 1202. That court found that no successor liability existed not only because the transferor was already insolvent, but because it had no control over the decision to sell the assets or the price at which the assets were sold, and because another tribunal, the bankruptcy court, had already ruled that the sale was not fraudulent. *Id.*

### ii. Mere continuation exception

42. The Wisconsin Supreme Court has identified the key element to "mere continuation" as "common identity of the officers, directors and stockholders in the selling and purchasing corporations," such that the management and control of the successor corporation demonstrated that "in substance the successor corporation was the same entity as the predecessor sole proprietorship." *Fish v. Amsted Indus., Inc.,* 126 Wis.2d 293, 376 N.W.2d 820, 824–25 (1985) (citation and internal quotes omitted).[48]

43. Here, the nominal officers, directors, and shareholders of MJ Korea differed from those of the Lees' other corporations. *Compare* HX 1 at 2 (MJ Korea's company registry) *with* PX 16 (MAI, Ltd.'s company registry); PX 18 (Mijong Industries' company registry). Based on the evidence submitted at the evidentiary hearing, however, the Court finds that the lack of formal common ownership and management is by fraudulent design, not a reflection of the actual parties in control of MJ Korea, and thus does not prevent the Court from looking past the nominal ownership and management to redress a fraud. *See Brownfield Investment Corp., N.V. v. United States,* 1992 U.S.Dist. LEXIS 9570, *12 (N.D.Cal.1992) (court found unity of interest and equitable ownership for alter ego purposes where alien alter ego erected offshore trusts nominally owned by Bermudan banks to hide assets); *In re D.H. Overmyer Telecasting Co. (Hadar Leasing Int'l Co. v. D.H. Overmyer Telecasting Co.),* 53 B.R. 963, 985 (N.D.Ohio 1984) ("[a]n equity court ... has broad powers to fashion a remedy to redress a fraud committed upon [a plaintiff] and the court itself"), *aff'd,* 787 F.2d 589 (6th Cir.1986).

44. The following evidence demonstrates that the Lees, with the assistance of the Hans, controlled MJ Korea and the Han/Lee partnership before and after the Hans purchased MJ Korea's stock:

a. In a memorandum from Rudolph to Nowak regarding corporate "insulation," which was produced from MAI's files, (PX 278), Rudolph stated that "[t]he individual client should not be a shareholder, officer or director of any new corporate entity" but should "consider setting up new corporations for the sale or distribution of old products." (FOF 16.)

b. The Hans recognized that MJ Korea was the Lees' business prior to the stock purchase. (FOF 42, 47, 48.)

c. Min Suk Han testified that he and Yang Ok Han did whatever the Lees told them to do. (FOF 60.)

d. In the Agreement, the Lees and Min Suk Han agreed to split profits three ways and put the Lees in charge of MJ Korea's manufacturing, sales, and inventory control. (FOF 77.)

e. In a letter in her handwriting, Yang Ok Han stated that she "provided answers" to Jerry Lee. (FOF 61, 109.)

f. At the hearing, Yang Ok Han testified that Joy Lee instructed her to copy letters which Yang Ok Han did not understand into her own handwriting and to send them to Wilcox. (FOF 109, 110.)

45. Accordingly, the Court concludes that, by reason of the common and continuous management and control by the Lees, MJ Korea (later consolidated under the Han/Lee partnership) was effectively the same entity (albeit operating under a different name) the Lees previously had used to conduct the Grip Toys business.

46. Mere continuation also exists where the predecessor effectively transfers its entire business to a successor. *See Panther Pumps,* 566 F.2d at 25 (where entire

---

**48.** It appears, therefore, that the Han respondents' assertion that successor liability must be predicated on a transfer of substantially all of predecessor's assets, (Post–Hearing Brief at 22), is false. Were it otherwise, the Court would nevertheless conclude that such a transfer had, in fact, occurred. (*See* COL 47.) The Han respondents' assertion that the mere continuation exception requires that the successor corporation pay less than adequate consideration for the assets, (Post–Hearing Brief at 26), moreover, is unsupported by the authority presented. Because Wisconsin law governs, the California cases cited by the Han respondents are inapposite. As to *Leannais,* 565 F.2d 437, we find the Han respondents' assertion in error. In that case, the Seventh Circuit noted the relevance of inadequate consideration only to the *merger* exception, not the mere continuation exception. *Id.* at 439–40.

business transferred to successor, court found successor liable) (citing *Brunswick Corp. v. Chrysler Corp.*, 408 F.2d 335 (7th Cir.1969)); *Tift v. Forage King Indus., Inc.*, 108 Wis.2d 72, 322 N.W.2d 14, 18 (1982) (successor corporation found liable for predecessor sole proprietorship's defective product; "[t]he present organization, although it has undergone a structural metamorphosis, remains in substance the identical organization manufacturing the same product.... [i]t is liable for the defective product manufactured by the original business organization").[49]

47. The evidence establishes that MJ Korea and the Han/Lee partnership are the mere continuation of the Lees' Grip Ball business. To wit:

a. MJ Korea continued to sell to, and receive payment from, the Lees' former Grip Ball customers. (FOF 29, 30, 34.)

b. MJ Korea conducted its Grip Toys business out of the same office and using the same telephone number as MAI, Ltd. (FOF 34.)

c. The Hans purchased the stock of MJ Korea, and entered into the Han/Lee partnership, based upon Jerry Lee's representations that MJ Korea owned all of the assets of the former Grip Toys companies, *i.e.*, approximately $6 million in raw materials previously owned by MAI, Ltd. and MAI, Ltd.'s $12 million account receivable due from MAI. (FOF 48, 78.)

d. Min Suk Han obtained the right to receive the expected $11 million surplus from MAI, Ltd.'s $12 million account receivable as a part of the partnership deal. (FOF 78.)

e. Min Suk Han invested in MJ Korea and the Han/Lee partnership agreement based upon the profitable performance of the pre-MJ Korea Grip Ball business and the promise that the profits would continue. (FOF 48, 72, 78.)

f. MJ Korea inexplicably possessed the Korean patent for Grip Ball. (FOF 31.)

g. Between a half and two-thirds of MJ Korea's employees were former MAI, Ltd. employees. (FOF 57.)

h. MJ Korea took over the customer base and distribution channels from the former Grip Ball business. (FOF 29, 30, 34, 64, 70, 87, 124.)[50]

### f. Secondary successors MHW and Longreen

48. Paliafito also argues that MHW and Longreen, as alter egos used by MJ Korea and the Han/Lee partnership to conduct the Grip Toys business, are subject to personal jurisdiction as successors in interest and mere instrumentalities.

49. As discussed below, the Court is persuaded by the evidence that MHW and Longreen were formed to escape liability for the debts of their instrumentality MJ Korea. Additionally, the assets of both MHW and Longreen consist entirely of assets transferred to them by MJ Korea or property acquired with the transferred assets. (FOF 98, 103, 105, 106, 154, 155, 160.) Accordingly, MHW and Longreen are thus also subject to

49. The Han respondents correctly argue, (Post-Hearing Brief at 21), however, that under Wisconsin law, identity of *product line* between seller and purchaser corporation is not independent grounds for imposing successor liability. *See, e.g., Fish v. Amsted Industries, Inc.*, 126 Wis.2d 293, 376 N.W.2d 820, 824 (1985) (explaining *Tift*). *Cf. Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1459 (11th Cir.1985) (in determining whether successor liability lies for default judgment, test for mere continuation is "whether there is a continuation of the corporate entity of the seller—not whether there is a continuation of the seller's business operation").

50. Relying on *Armour–Dial*, 469 F.Supp. at 1201–02, and *National Dairy Products Corp. v. Borden Co.*, 363 F.Supp. 978, 980 (E.D.Wis.1973) (Gordon, J.), the Han respondents argue that the facts of MJ Korea's identical address, fax number, and employees are insufficient to invoke the mere continuation exception. (Post–Hearing Brief at 26.) While we do not quarrel with the rule that the mere fact that a successor continues to employ the predecessor's employees, *Acme Boot Co. v. Tony Lama Interstate Retail Stores, Inc.*, 929 F.2d 691, 1991 WL 39457 (4th Cir. 1991) (unpublished disposition), or continues the predecessor's operations, *Armour–Dial*, at 1201, usually does not render the successor liable for the predecessor's obligations, our situation is easily distinguishable. Here, we have found not only continued employment and operations, but also continued control, (COL 44, 45), and an arguably wholesale transfer of the Grip Toys business. (COL 46, 47.)

jurisdiction under Rule 25(c) and principles of successor liability.[51]

### g. Effects of the Hans' purchase of MJ Korea

■ 50. The Hans' assertion that they purchased the stock of MJ Korea in late April 1993 from the Lees and thereafter controlled MJ Korea does not relieve MJ Korea, or any of its subsequent transferees, from responsibility to comply with this Court's orders, *see Universal Die & Stampings, Inc. v. Justus,* 174 Wis.2d 556, 497 N.W.2d 797, 801 (App.1993) (successors bound to injunction proscribing conduct of predecessor: "[w]ere it not for this rule, injunctions could be easily evaded by a transfer of assets to one who could engage in the prohibited conduct until an action could be concluded against the transferee"), or from liability to Paliafito on its judgment. It is hornbook law that the acquisition of a corporation through the purchase of its stock does not affect the liabilities of the corporation, disclosed or undisclosed, and does not in any way impair a creditor from collecting on a claim against the corporation out of its assets.

Upon transfer of the outstanding stock of the corporation, the buyer will succeed to the ownership of a corporation endowed with the same assets and encumbered with the same liabilities as existed prior to transfer. The buyer may seek to protect itself from undisclosed liabilities by obtaining indemnification from the selling stockholders with respect to undisclosed liabilities, but the corporation whose stock is being acquired remains primarily responsible for such liabilities and its creditors are entitled to look to it and not the selling stockholders for satisfaction of their claims.

1 John W. Herz & Charles H. Baller, *Business Acquisitions* 149 (2d ed. 1981) (emphasis added).[52] *See Tift,* 108 Wis.2d 72, 322 N.W.2d at 15 (corporation, started by related predecessor, whose stock was later acquired by unrelated corporation, was liable for defective product manufactured by predecessor sole proprietorship under successor liability principles).[53]

### 2. Alter ego principles

51. Paliafito argues that Longreen and MHW, as mere instrumentalities used by Min Suk Han and MJ Korea to protect their property from execution on Paliafito's $8 million judgment, are subject to the jurisdiction of the Court under the "reverse" alter ego, or piercing the corporate veil, doctrine.

52. As to Paliafito's conclusion, at least, the Court agrees.

■ 53. The alter ego doctrine enables a court to disregard the corporate form when it is used to accomplish an improper purpose. "[I]f an intracorporate affiliation is devised for or is being used to accomplish an improper or unlawful purpose, equity has the authority to tear down technical legal barriers and ... grant appropriate relief." 1 *Fletcher Cyclopedia Corporations* § 41.10, at 157.[54]

---

**51.** The Han respondents argue that Yang Ok Han is not liable personally for the obligations of MHW because there is no proof that MHW disregarded corporate formalities. We disagree, and, as noted *infra*, find that Yang Ok Han is MHW's alter ego. (COL 81.)

**52.** The authors further note that "[t]he principal disadvantage of a stock acquisition, at least from the buyer's standpoint, is that the assets being purchased remain at risk to all of the seller's liabilities." *Id.*

**53.** Because Paliafito has not demonstrated, however, that applying the corporate fiction to MJ Korea, as to Min Suk Han, as an individual, would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim, we conclude that Min Suk Han, as an individual, is not liable for the obligations of MJ Korea. *See Poulos v. NAAS Foods, Inc.,* 132 F.R.D. 513, 518–19 (E.D.Wis. 1990); *Consumer's Co-op of Walworth County v. Olsen,* 142 Wis.2d 465, 488, 419 N.W.2d 211, 219 (1988). *See also McCall Stock Farms, Inc. v. United States,* 14 F.3d 1562, 1567 n. 4 (Fed.Cir. 1993) ("[i]t is generally recognized that disregarding the legal separateness of a corporation and the individuals who control it entails the exercise of equitable power").

**54.** "[T]he alter ego theory allows the court to ignore technical differences between two corporations where the second corporation was created merely to avoid the effect of ... laws." *See American Bell, Inc. v. Federation of Telephone Workers of Pa.,* 736 F.2d 879, 889 (3rd Cir.1984).

54. Although the alter ego doctrine is typically employed to pierce the corporate veil of a controlled entity to reach the assets of the controlling party (usually a shareholder or a parent corporation, *see, e.g., Leach Co.,* 393 F.2d 183), the doctrine can also be applied in reverse to reach the assets of a controlled entity. It is particularly appropriate to apply the alter ego doctrine in "reverse" when the controlling party uses the controlled entity to hide assets or secretly to conduct business to avoid the pre-existing liability of the controlling party.

> The [alter ego] remedy is equally available to hold the corporation liable for debts of the controlling shareholders where the shareholders have formed or used the corporation to hide assets and thus avoid preexisting personal liability. Where a creditor proves that controlling shareholders organized or used the corporation to deceive or defraud personal creditors, the separate existence will be disregarded and the corporation and the shareholders will be treated as one and the same. Once a sufficient showing has been made that the corporation is the alter ego of the debtor, the corporation is treated as the debtor and its property may be attached to insure that the final judgment will be satisfied should the creditor ultimately prevail.

1 *Fletcher Cyclopedia Corporations* § 41.70 at 707 (1990). *Accord McCall Stock Farms, Inc.,* 14 F.3d at 1568 ("overwhelming weight of authority" recognizes reverse alter ego doctrine to reach assets of fronts) (citing cases). *Cf. Van Dorn Co. v. Future Chem. and Oil Corp.,* 753 F.2d 565, 572 (7th Cir. 1985) (applying Illinois law) (court affirmed disregard of corporate form to find solvent corporation liable for debts of its insolvent sister corporation under alter ego doctrine).

55. Once an alter ego relationship is found, both the alter ego and the controlled entity will be subject to the jurisdiction of the Court, so long as one of the parties is subject to jurisdiction in its own right. *See Leach Co.,* 393 F.2d at 185–86 (court affirmed that district court could treat subsidiary and alter ego **parent corporation the same for purposes of jurisdiction**); *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1349–51 (2nd Cir.1974) (court affirmed district court's finding that it had jurisdiction over Vesco & Co., a corporation fraudulently formed to receive assets from judgment debtor Vesco, even though Vesco & Co. had no contacts with forum state, under alter ego principles), *cert. denied,* 434 U.S. 1014 (1978).

56. A court applies the law of the state of incorporation of the controlled corporation to determine whether the corporate form should be disregarded. *See Kalb, Voorhis & Co. v. American Fin. Corp.,* 8 F.3d 130, 132 (2d Cir.1993) (citing *Restatement (Second) of Conflicts of Laws* § 307 (1971) (" 'The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation ... and to its creditors for corporate debts' ")).

### a. Longreen

57. Longreen is a California corporation. (FOF 6.) Accordingly, the Court must look to California law to determine whether MJ Korea is the alter ego of Longreen, thus subjecting Longreen to the jurisdiction of this Court.

58. Under California law, alter ego liability is applicable where "(1) such a unity of interest and ownership exist that the personalities of the corporation and individual are no longer separate and (2) an inequitable result will follow if acts are treated as those of the corporation alone." *See RRX Indus., Inc. v. Lab–Con, Inc.,* 772 F.2d 543, 545 (9th Cir.1985) (citing *Automotriz Del Golfo de California S.A. De C.V. v. Resnik,* 47 Cal.2d 792, 796, 306 P.2d 1 (1957)). Because alter ego liability is an equitable doctrine, " 'the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case.' " *Las Palmas Assoc. v. Las Palmas Center Assoc.,* 235 Cal.App.3d 1220, 1 Cal.Rptr.2d 301, 317 (1991) (citations omitted).

59. A court may consider a variety of circumstances, including: (1) the identical equitable ownership in the two entities; (2) the identification of the equitable owners thereof with the domination and control of the two entities; (3) the use of the same

office or business location; (4) the employment of the same employees and attorneys; (5) the use of a corporation as a mere shell, instrumentality, or conduit for a single venture or the business of an individual or another corporation; (6) the concealment and misrepresentation of the identity of the responsible ownership, management, and financial interest; (7) the failure to maintain arms' length relationships among related entities; (8) the use of the corporate entity to procure labor, services, or merchandise for another person or entity; and (9) the use of a corporation as a subterfuge for illegal transactions. *See Associated Vendors, Inc. v. Oakland Meat Co., Inc.,* 210 Cal.App.2d 825, 26 Cal. Rptr. 806, 815–16 (1st Dist.1962) (citations omitted).

■ 60. California law also allows the alter ego doctrine to be applied in reverse, that is, to enable a court to reach the assets of the controlled entity. *See Brownfield Investment Corp., N.V. v. United States,* 1992 U.S.Dist. LEXIS 9570, at *11 (N.D.Cal.1992) (applying California law) (citing *Taylor v. Newton,* 117 Cal.App.2d 752, 758–60, 257 P.2d 68 (1953)).

■ 61. Applying California law to the facts of this case, the Court concludes that MJ Korea is the alter ego of Longreen through its equitable ownership, complete domination, control, and use of Longreen as an instrumentality to escape liability to Paliafito.

62. The following evidence establishes that Longreen is the mere instrumentality of MJ Korea.

63. Prior to the bankruptcy auction, Aver, MJ Korea's attorney, in conjunction with Yang Ok Han and Oh, MJ Korea employees, set up Longreen to purchase the assets of MAI. (FOF 137.) At the time, Aver and MJ Korea were aware that Paliafito might seek to block any attempt by MJ Korea to purchase MAI's assets. (FOF 134, 135.)

64. Longreen was funded by a $2.5 million loan nominally from Paek, Longreen's president and sole shareholder. MJ Korea, in turn, loaned Paek the $2.5 million to capitalize Longreen and required Paek to pledge Longreen's stock and all of Longreen's assets to secure repayment. (FOF 154–56.) [55]

65. Min Suk Han controls Paek.[56] Min Suk Han sent Paek to the U.S. to work for him personally and MJ Korea. (FOF 140, 144.) Paek, purportedly an independent actor, actually reports to Oh, the manager of MJ USA, and must obtain Oh's approval before he spends any of the proceeds from the MJ Korea loan. (FOF 161, 160.)

66. The day after Paek arrived in the U.S., he met Aver (now representing Longreen), with whom Oh put him into contact, and signed the loan agreements and the other incorporation documents. (FOF 145–46.)

67. Longreen sends all of its earnings, less a percentage to Paek, to MJ Korea, (FOF 162), and shares an address with MJ USA. (FOF 163.)

68. The Han respondents' conduct at the MAI bankruptcy auction does not contravene the Court's conclusion that Longreen is a shell corporation controlled by MJ Korea to escape liability to Paliafito.

69. At the auction, Aver, Yang Ok Han, and another MJ Korea employee, all of whom Salisbury, MAI's chapter 7 trustee, knew were affiliated with MJ Korea, conspicuously separated themselves across the room from the Longreen group, composed of Paek, a broker, and Oh, the manager of MJ USA, none of whom Salisbury knew. (FOF 170, 172.)

70. Jones, a registered agent for Longreen, and Oh, manager of MJ USA with no official connection with Longreen, submitted the winning bid for MAI's assets on behalf of Longreen. (FOF 174, 176.) Oh possessed, and presented, the cashiers' checks used to

---

**55.** Min Suk Han was not even aware of the Paek loan or any of the other details of the formation of Longreen. He testified that he gave $2.5 million to Oh, the manager of MJ USA, to give MJ Korea a "stronger root [in the United States] ... to help the main office." (FOF 155.)

**56.** The Court finds incredible Paek's contrary testimony.

purchase the assets. (FOF 177, 178.) On the bid confirmation sheet, Longreen listed an address from which it conducts no business. (FOF 179, 180.) In response to Salisbury's inquiry, Oh also denied that Longreen had any tie to the Lees or any other entity involved in this litigation. (FOF 181.)

71. At no time did anyone in the Longreen group or in the MJ Korea group indicate to Salisbury that they were related. (FOF 183.) In fact, the Longreen group and the MJ Korea went to considerable lengths to avoid any contact with each other that suggested a relationship. Salisbury testified that he believed that the two groups had engaged in "active and conscious deceit." (FOF 185.)

72. Accordingly, the Court finds that Longreen is a mere instrumentality of its alter ego, MJ Korea, and is thus subject to the jurisdiction of the Court.

### b. MHW

73. MHW is a Tennessee corporation. (FOF 5.) Accordingly, the Court will apply the alter ego doctrine as elaborated in Tennessee law.

74. Tennessee law recognizes the broad principle that "[a] separate entity may be disregarded upon the showing of special circumstances, such as, that the corporation is a sham or dummy so that failure to disregard it would result in an injustice." *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn.1985) (citations omitted). The Tennessee alter ego, or instrumentality, theory requires proof of the following three elements:

(1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to the transaction, had no separate mind, will or existence of its own.

(2) Such control must have been used to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.* (citation omitted).

75. We are unaware that any Tennessee court has expressly authorized application of the alter ego doctrine in reverse. Given, however, the basic policy underlying Tennessee's alter ego doctrine, namely to redress fraud or wrong perpetrated through an instrumentality, the Court will apply the alter ego doctrine in reverse to reach the assets of MHW. *See Century Hotels v. United States*, 952 F.2d 107, 110 (5th Cir. 1992) (applying Louisiana law) (affirming district court's application of reverse alter ego doctrine in absence of contrary state law).

76. The evidence indicates that MHW, of which Yang Ok Han owned one hundred percent and which she funded with earnings from MJ Korea, was Joy Lee's idea. (FOF 97–99.) The Lees and MJ Korea apparently created MHW pursuant to Jerry Lee's plan to do business in the U.S. through instrumentalities. (FOF 64, 70.)

77. MHW had one employee, Kevin Lee. Joy Lee and Kevin Lee conducted MHW's business out of the same Walnut, California office used by ConPro, another instrumentality, and MJ USA. (FOF 100, 101.)

78. MHW was formed without any funding. (FOF 98.)

79. MHW's business was to hold Grip Toys inventory. Currently, MHW's only asset is inventory located in bonded warehouses. (FOF 103, 105.) This inventory, however, is currently owned by MJ Korea. (FOF 106.)

80. As the evidence demonstrates, MHW was at all times controlled by the Lees and MJ Korea and funded by MJ Korea and had no separate mind or will of its own.

81. Accordingly, Paliafito has demonstrated that MHW is an instrumentality of the Lees and MJ Korea and is thus subject to the jurisdiction of the Court. Because the Court has jurisdiction over MHW, it also has jurisdiction over MHW's alter ego, Yang Ok Han.

### 3. Rule 71, Fed.R.Civ.P.

82. Under these circumstances, the status of the Han respondents as nonparties is no barrier to enforcement of the Court's orders against them. Under Rule 71, Fed. R.Civ.P., the Court may enforce its orders against bogus and fraudulently created non-parties. *See, e.g., In re D.H. Overmyer Telecasting Co. (Hadar Leasing Int'l. Co. v. D.H. Overmyer Telecasting Co.),* 53 B.R. 963, 985 (N.D.Ohio) (1984), *aff'd,* 787 F.2d 589 (6th Cir.1986).

83. Rule 71, Fed.R.Civ.P., provides:

When an order is made in favor of a person who is not a party to the action, he may enforce obedience to the order by the same process as if he were a party; and when obedience to an order may be lawfully enforced against a person who is not a party, he is liable to the same process for enforcing obedience to the order as if he were a party.

Fed.R.Civ.P. 71 (emphasis added).

84. In *D.H. Overmyer,* a similar case, the district court applied Rule 71 in affirming a bankruptcy court's entry of judgment against non-party instrumentalities created to hide assets and evade creditors. Daniel Overmyer, the owner of a number of subsidiaries operating under a company known as D.H. Overmyer Co., Inc. devised and implemented a scheme to defraud creditors. In furtherance of this scheme, Overmyer and the entities he controlled "used the protection of the bankruptcy courts to avoid paying creditors, while moving and concealing their assets by transferring said assets from entity to entity." *D.H. Overmyer,* 53 B.R. at 971. With the assistance of his lawyer, Overmyer also changed corporate names to conceal assets, transferred subsidiary corporations to trusts he controlled, and violated court orders by destroying documents to conceal his activities. *Id.* at 971–72.

85. The First National Bank of Boston ("FNBB"), the principal creditor of Overmyer and his companies, obtained an oral ruling from an Ohio state court granting its motion to appoint a receiver. But before the receiver could actually be appointed, Overmyer put his business into bankruptcy to deny the receiver any power. *Id.,* 53 B.R. at 972.

86. In an adversary proceeding brought in the bankruptcy, FNBB obtained a judgment against Overmyer and several of his companies. *Id.* at 968. The judgment also required the transfer to FNBB of property titled under the names of various non-party companies that Overmyer had used to hide assets. *Id.*

87. The non-party corporations intervened in Overmyer's appeal of the judgment to the district court. *Id.* at 968. The intervenors objected to the enforcement of the judgment against them on the grounds that they had not been parties or received notice or an opportunity to be heard in the adversary proceeding. *Id.* at 982.

88. The district court rejected their complaints, noting that federal courts have consistently found that a non-party may be bound by a judgment if a party to the suit's interests are so closely aligned to the non-party's interests as to be its representative. *Id.* at 982–83 (citing cases). The district court held:

The record is clear that the Overmyer Intervenors were totally controlled by Daniel H. Overmyer, and that there was such a unity of interest between Mr. Overmyer and those intervening parties that the findings of the bankruptcy court must be binding upon all parties to the fraud. Although the law will ordinarily treat corporations such as the Overmyer Intervenors as entities distinct from their owners, whenever it is necessary to relieve a fraud the individual corporate entities shall be disregarded.

*Id.* at 984 (citations omitted).

89. The district court also dismissed the intervenors' claim that due process entitled them to service of process and an opportunity to be heard. Because Overmyer had received due process, so had the intervenors.

In this action, Daniel H. Overmyer received adequate notice and an opportunity to be heard as required by the Constitution prior to a judgment being entered against him.... Since Mr. Overmyer received the required due process proce-

dures, the intervenors, who do not dispute being his alter ego, have also been afforded the required constitutional protection in regard to those assets which were fraudulently obtained. . . .

*Id.* (citations omitted).[57]

90. *D.H. Overmyer* demonstrates that, as the record establishes, the Court not only has jurisdiction over MJ Korea, MHW, Yang Ok Han and Longreen, but also that the Court's judgment against the Mantae defendants is fully enforceable against property titled in the name of MJ Korea, MHW, Longreen, or any other instrumentality, if erected to evade this Court's orders (as to which we draw no conclusion herein).

### 4. Aiding and abetting violations of our orders

91. Paliafito argues that the Hans, Longreen, and MJ Korea are also subject to the jurisdiction of the Court because, with actual notice of the First Supplemental Writ, they aided and abetted the Lees' scheme to violate the First Supplemental Writ.

92. We disagree.

93. Whether the Lees violated the First Supplemental Writ is the subject of Paliafito's motion for civil contempt, currently *sub judice.* We thus decline to address the issue here. As such, we are unable to determine whether the Han respondents, as successors in interest, violated the First Supplemental Writ, or otherwise aided and abetted the Lees.

94. Even assuming, *arguendo,* that the Lees violated the First Supplemental Writ, we nevertheless decline to exercise jurisdiction over the Han respondents as aiders and abettors. We concur in the applicable standard, but find the evidence inconclusive.

95. In *Reebok Int'l Ltd. v. McLaughlin,* 827 F.Supp. 622, 624–25 (S.D.Cal.1993), the Southern District of California held a foreign bank, with no contacts with the United States but with notice of the terms of the court's injunction, in civil contempt for aiding and abetting a violation of an order freezing the contemnor's assets.

96. In *Reebok,* the totality of the evidence suggested that the foreign bank, contrary to its prior representations, had:

[a]ssisted [the contemnor] in the development and execution of a plan to get [the contemnor's] money out of [the foreign bank]. The plan included the creation of [a front company for the contemnor], and the transfer of funds within [the foreign bank] so as to create a safe haven.

*Id.* at 623; *see also Waffenschmidt v. Mac-Kay,* 763 F.2d 711, 717 (5th Cir.1985) (nonparties residing without territorial jurisdiction of district court may be subject to court's jurisdiction if, with actual notice of court's order, they actively aid and abet party in violating that order, even if non-parties have no other contacts with forum), *cert. denied sub nom, Currey v. Waffenschmidt,* 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986).

97. The *Reebok* court rejected the foreign bank's challenge to its personal jurisdiction. *Id.* at 624. The court noted that the foreign bank did not do business in California or in the United States, but found that this factor, under the traditional *International Shoe* "minimum contacts" analysis, was not dispositive.

The essential contact, however, relates to the allegations of assisting [the contemnor] in his efforts to release the funds held [at the foreign bank]. By providing such assistance, [the foreign bank] engaged in activity outside of California "that would have the foreseeable and intended result of dissipating assets subject to the marshalling in that forum."

*Id.* (citations omitted).[58]

98. The *Reebok* court also upheld personal jurisdiction under "the court's inherent

---

**57.** The court cited Section 41(2) of the Second Restatement of Judgments in support of its holding. Section 41(2) states: "A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process." Restatement (Second) of Judgments § 41(2) (1980).

**58.** The Han respondents argue that this approach has been rejected specifically by the Second Circuit in *Canterbury Belts, Ltd. v. Lane*

authority to enforce its own orders" under Rule 65. *Id.* (citations omitted). Quoting the district court in *New York State Nat'l Org. for Women v. Terry,* 732 F.Supp. 388, 400 n. 5 (S.D.N.Y.1990), *aff'd in relevant part and rev'd in part on other grounds,* 961 F.2d 390 (2d Cir.1992):

> Respondents' brash assertion that they should be allowed to act in concert with defendants in order to intentionally violate a court order of which they had actual notice, while retaining impunity from the imposition of coercive sanctions fashioned to assure compliance with the order, is as groundless as it is insolent.

*Id.*

99. Under Rule 65(d) of the Federal Rules of Civil Procedure, an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed.R.Civ.P. 65(d).

■ 100. A non-party need not be formally served with an injunction to trigger aider and abettor liability. All that is required is that the aider and abettor be given "fair notice that acting in concert with the named defendants would subject them to contempt proceedings." *New York State Nat'l Org. for Women v. Terry,* 961 F.2d 390, 398 (2nd Cir.1992), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 1233, 122 L.Ed.2d 640 (1993).

101. Rule 65(d) "[is] a codification of the common-law rule allowing a non-party to be held in contempt for violating the terms of an injunction when a non-party is legally identified with the defendant or when the non-party aids or abets a violation of an injunc-

tion." *Illinois Dept. of Public Aid v. United States Dept. of Health & Human Ser.,* 772 F.2d 329, 332 (7th Cir.1985). *See also Herrlein v. Kanakis,* 526 F.2d 252, 254 (7th Cir. 1975) (Rule 65(d) codifies the rule stated by L. Hand, J., in *Alemite Mfg. Co. v. Staff,* 42 F.2d 832, 33 (2d Cir.1930) ("[the non-party] respondent must either abet the defendant or must be legally identified with him")).

102. The purpose of Rule 65(d) is "in essence to ensure 'that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.'" *Id.* (quoting *Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945)).

103. "The most well-accepted formulation of the standard of proof for aiding and abetting is that expressed by Judge Learned Hand in *United States v. Peoni,* 100 F.2d 401 (2d Cir.1938). He wrote that the prosecution must show that the defendant 'in some sort associate himself with the venture, that he participate in it as in something he wishes to bring about, (and) that he seek by his action to make it succeed.' *Id.* at 402." *United States v. Beck,* 615 F.2d 441, 448 (7th Cir. 1980). *See also United States v. Hooks,* 848 F.2d 785, 789 (7th Cir.1988) (citations omitted).

■ 104. The standard for proof of aiding and abetting has two prongs, "association and participation;" that is, intent plus "[an] overt act designed to aid in the success of the venture." *Beck,* 615 F.2d at 448–49. *See also United States ex rel. Vuitton Et Fils S.A. v. Karen Bags,* 602 F.Supp. 1052, 1064 (S.D.N.Y.), *aff'd sub nom., United States ex rel. Vuitton Et Fils S.A. v. Klayminc,* 780 F.2d 179 (2d Cir.1985) (applying standard in context of criminal contempt).

---

*Walker Rudkin, Ltd.,* 869 F.2d 34, 40 (2d Cir. 1989). In *Canterbury,* the court recited that a district court cannot exercise personal jurisdiction over a non-party on the basis that it is acting in active concert or participation with parties subject to an injunction, in holding that the district court erred in concluding that a parent corporation was not amenable to jurisdiction in New York solely because, when considered separately from its subsidiary, it conducted no business there. *Id.* That recitation, however, relied on *Heyman v. Kline,* 444 F.2d 65 (2d Cir.1971),

which the Second Circuit has since distinguished from a situation, arguably like ours, where "a person ... interfere[s] with the *res,* the disposition of which the district court ha[s] specifically restricted, and ... consciously impede[s] the rights, obligations and efforts of the parties bound by the court's order from attempting to comply with valid court orders." *United States v. Paccione,* 964 F.2d 1269, 1275 (2d Cir.1992) (unnamed non-party subject to contempt order despite "substantial issue of due process").

105. Paliafito, however, has failed to demonstrate that the Han respondents had fair notice that acting in concert with the Lees or their affiliates would subject them to contempt proceedings, and has also failed to demonstrate that the Han respondents aided and abetted the Lees.[59]

### 5. The Federal Receivership Statute

106. The Han respondents challenge this Court's jurisdiction over the property sought to be attached. Noting that the inventory subject to Paliafito's proposed attachment is located in or around Memphis, Seattle, and Los Angeles, they argue that, because it is located outside Wisconsin, the Court (through the Receiver) cannot reach it.

107. The Han respondents also argue that, in light of the Wisconsin state long arm statute, Paliafito must demonstrate that the Han respondents had minimum contacts with Wisconsin before the Court can assert personal jurisdiction over them.

108. Both arguments are erroneous.

#### a. Federal receivership reaches every judicial district

 109. Paliafito requests that the Court appoint Douglas Mann and Michael Dubis co-receivers pursuant to federal law— *i.e.,* Fed.R.Civ.P. 66 and 28 U.S.C. § 754— and not state law, to collect a judgment entered on Paliafito's federal RICO claims.[60] Accordingly, the Han's reliance upon state-law authorities is misplaced.

110. Federal receivers are empowered pursuant to 28 U.S.C. § 754 to collect assets anywhere in the United States. Section 754 states:

> A receiver appointed in any civil action or proceeding involving property involving property, real, personal, or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.
>
> * * * * * *
>
> Such receiver shall, within ten days after the entry of his order of appointment, file copies of the complaint and such order of appointment in the district court for each district in which property is located....

28 U.S.C. § 754. *See Haile v. Henderson Nat'l Bank,* 657 F.2d 816 (6th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1450, 71 L.Ed.2d 663 (1982) (discussing nationwide reach of federal receivers).

111. Here, Paliafito asks the Court to reappoint a receiver to collect assets subject to Paliafito's judgment. As such, to confirm his jurisdiction over the subject properties, the appointed receiver need only file, within ten days of his appointment, copies of the underlying complaint, judgment, and order of appointment in the Western District of Tennessee, the Eastern District of Arkansas, the Eastern District of Washington, or such other districts in which the Han respondents' properties are located. Nothing more is required.

---

59. Yang Ok Han received a copy of the First Supplemental Writ attached to a letter from Paliafito's counsel on or about August 16, 1993. (FOF 112.) Whatever it may suggest about their credibility, the evidence does not demonstrate that, before then, the Hans were aware of the injunction and were actively assisting the Lees to violate it for their own pecuniary benefit. In light of the indeterminate status of the partnership, moreover, the facts that Min Suk Han did not terminate the Agreement until October 1993, (HX 54), and that, in the interim, MJ Korea apparently made a shipment to MHW, (PX 288 at 2 (entry indicates shipment to MHW from MJ Korea on August 27, 1993)), are not conclusive, or even very probative, as to the nature of the Hans' relationship with the Lees during that period. Finally, though Min Suk Han testified that MJ Korea is currently doing business with PTKSS, (FOF 234), Paliafito has failed to show how this violates the First Supplemental Writ.

60. The Court entered judgment in the amount of $8 million against the Mantae defendants on Paliafito's claims that the Mantae defendants violated the federal RICO statute, 18 U.S.C. §§ 1961–65. The federal RICO statute authorizes nationwide service of process, 18 U.S.C. § 1965(b), and requires only that the defendant have sufficient contacts with the United States. *See Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 671–72 (7th Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 700 (1988). The Han entities all have multiple, ongoing contacts with the United States: MJ Korea has a "branch" here, Yang Ok Han does business here, and, of course, Longreen and MHW are domestic U.S. corporations.

### b. The Wisconsin long arm statute is inapplicable

112. Additionally, if necessary, the Receiver may also bring a proceeding before this Court against any person claiming an interest in the attached property and may serve the interested party with process in any judicial district where the receiver has filed the complaint and order of appointment. *See* 28 U.S.C. § 1692; *Haile*, 657 F.2d at 826 ("The process authorized by § 1692 is not 'extra-territorial' but rather nationwide.... The appointment court's process extends to any judicial district where receivership property is found.... As such, the minimum contacts analysis, as a limitation on state extra-territorial power, is simply inapposite").

113. Here, within ten days of entry, Paliafito, on behalf of the Receiver, filed the complaint and the First Supplemental Writ

in the Central District of California. Thus, even under the federal receivership statute, process can be served on Longreen, a California corporation with a registered agent located in the Central District of California.[61]

114. Accordingly, to whatever extent the Han respondents claim any interest in the attached property, the Court, with nationwide jurisdiction, will be able to adjudicate those claims.

115. For the foregoing reasons, the Court concludes that it has personal jurisdiction over MJ Korea, MHW, Yang Ok Han, and Longreen. Accordingly, the Court has the power to enforce the terms similar to those of the Second Supplemental Writ as it relates to their conduct and any property interest which they claim and add them to the partial judgment entered herein on September 28, 1993.[62]

---

**61.** Of course, as discussed above, Paliafito need not rely on the federal receivership statute for nationwide service of process. Under Rule 25(c), a Rule 25(c) motion to add a successor defendant may be served in any judicial district.

**62.** Appealing finally to notions of equity, the Han respondents argue that, regardless of our adverse resolution of the jurisdictional issue, the Court should: (1) decline to join them as parties; and (2) decline to add them to the judgment entered against the Mantae defendants; or, (3) in the alternative, hold a hearing on the Rule 25(c) motion. (Opposition to Paliafito's Motion at 12.) None of these arguments is persuasive. The first is unsupported by any authority. The second is obviated by our finding, *supra*, that the Han respondents are the transferees of the Grip Toys business. The third is simply another permutation of their previous due process claims. In general, the Court notes, due process requires, at a minimum, notice and an opportunity to be heard. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 332–33, 96 S.Ct. 893, 901–02, 47 L.Ed.2d 18 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). We acknowledge, however, that the Han respondents' due process interests are particularly compelling given that joining them pursuant to Rule 25(c) would effectively impose liability. *See, e.g., Luxliner P.L. Export Co.*, 13 F.3d at 72 ("to join [the transferee] on the judgment without conducting a hearing would be to deprive [the transferee] of its only opportunity to develop the operative facts before being held liable for [the transferor's] actions"). Here, even such compelling interests have been protected. Service was required as to all the Han respondents and made effectively as to all but Min Suk Han (who we thus decline to join). Multiple opportunities to brief the issues

were provided. Finally, a comprehensive hearing was held, at which the facts relating to successor liability were fully aired. *Cf. id.*, at 72 (evidentiary hearing sufficient); *Greater Potater Harborplace, Inc. v. Jenkins*, 935 F.2d 267, 1991 WL 89830 (4th Cir.1991) (unpublished disposition) (no jury trial required). As such, the Han respondents' due process objections have been met, (COL 18, 33 n. 41, 89–90, 112–114), and their argument that entry of judgment would be otherwise inequitable must fail. *See Pacific Far East Line, Inc. v. R.J. Reynolds Industries, Inc.*, 1981 WL 2517, *23 (N.D.Cal.1981) (where successors, estate and trustee, had argued that such would be "unjust and highly inequitable," successors nevertheless held liable for sanctions against predecessor for discovery abuses and obstructing justice). *See also Luxliner P.L. Export Co.*, 13 F.3d at 71 ("substitution has been upheld even after litigation has ended"); *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 153–54 (6th Cir.1992) (affirming substitution in the context of proceeding to enforce a settlement agreement); *Explosives Corporation of America*, 817 F.2d 894, 905 (1st Cir.1987) ("[t]he underlying legal principle that a participating nonparty is bound by the judgment does not, however, depend on the procedural stance of the case ... this should not preclude substitution after judgment has been rendered ..." (citations omitted)); *Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.*, 775 F.2d 38, 40 (2d Cir.1985) (affirming substitution of successor after entry of judgment); *Air Line Pilots Ass'n v. Texas Int'l Airlines*, 567 F.Supp. 78, 81 (S.D.Tex. 1983) (where necessary for enforcement of a judgment, court can substitute party even after the judgment); *Levin v. Garfinkle*, 514 F.Supp. 1160, 1163 (E.D.Pa.1981) ("Rule 25(c) can be employed after entry of judgment....")

## III. Order

Now, therefore, in light of the foregoing,

**It is hereby ordered that:**

(1) The Han respondents' request for a determination of foreign law be **denied;**

(2) Paliafito's motion to admit into evidence PX 130, PX 327, PX 328, PX 329, PX 330, and portions of PX 184 be **granted;**

(3) Paliafito's motion to strike the Han respondents' reply to Paliafito's proposed findings of fact and conclusions of law be **granted;**

(4) Trojan's motion to strike certain of Paliafito's proposed findings of fact and conclusions of law be **denied;**

(5) Trojan's motion to file a response to Paliafito's proposed findings of fact and conclusions of law be **granted;**

(6) Paliafito's emergency motion for entry of a second supplemental writ of attachment, temporary restraining order, preliminary injunction, and the appointment of the receiver to perform additional duties be granted, to the extent contemplated herein;

(7) Paliafito file forthwith a proposed second supplemental writ reflecting the findings of fact and conclusions of law herein, to which proposed writ the Han respondents shall file a response, if any, within two days;

(8) Paliafito's motion pursuant to Rule 25(c), Fed.R.Civ.P., to join Min Suk Han; MJ Korea; MHW, Inc.; and Longreen Toys, Inc. as transferees of the interests of judgment debtors Miryoung ("Joy") Lee; Jong Sik ("Jerrold") Lee; MAI, Ltd.; Puff Pac Production, Ltd.; Best International Corp.; Chusik Hosea Kyongyong a/k/a Marue Joint Stock Trading Company d/b/a Best General Merchandise Corp. and Best General Merchandise (USA); and Grip Toys, Inc. under the Partial Judgment in a Civil Case entered on September 28, 1993, be denied as to Min Suk Han but otherwise **granted;**

(9) Paliafito's motion pursuant to Rule 54(b), Fed.R.Civ.P., for entry of judgment against Min Suk Han; MJ Korea; MHW, Inc.; and Longreen Toys, Inc., jointly and severally, in the amount of $8 million, and for

an appropriate certificate, be denied as to Min Suk Han but otherwise **granted.**